[Crim. No. 901. Fourth Dist. Apr. 25, 1951.]

THE PEOPLE, Respondent, v. CHARLES R. MERCER et al., Appellants.

Richard J. Weller for Appellants.

Edmund G. Brown, Attorney General, and Gilbert Harelson, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendants Charles R. Mercer and Carl Shockley were convicted by a jury of the crime of burglary (second degree) of a night club known as "Club Towers," near Colton. This appeal is based specifically on the questions of (1) the insufficiency of the evidence to support the verdict; (2) misdirection of the jury on a question of law; and (3) denying the motion for a new trial.

The fact that the night club was burglarized is not disputed. The facts tending to connect defendants with the commission of the crime are circumstantial. The building which was burglarized consisted of a café and cocktail lounge. Adjoining this room was a small office room in which was located a small safe about 11½ inches wide and 21 inches in height, weighing about 340 pounds. It was mounted in concrete. On the night of March 31, 1950, one of the partners placed in it about $1,100 in money, which was contained in three separate sacks. A revolver, an inventory, and a lease of the premises were also in the safe. About 2:35 a.m. on April 1st, after the business closed, the door to the safe was locked, as well as the doors to the building. About 10:30 on the morning of April 1st one of the proprietors entered the front door and found that the office door had been pried open with a jimmy. The safe had been broken loose from the cement and removed. Apparently, from the tracks on the floor, it was taken out by way of the front door. Four tracks from automobile tires, at the entrance to the front door, indicated that an automobile had been backed up to a cement walkway leading to the front door, and that the safe and its contents had been loaded into it. The rear door of the café had been

pried open from the outside with a jimmy. Footprints around the building and the weight of the safe indicated that at least two persons were involved in the burglary.

Upon discovering the facts related the proprietor called the sheriff's office and reported the burglary. Defendant Carl Shockley, who was then a deputy sheriff assigned to the burglary detail under a Lieutenant White, responded to the call. After examining the situation he remarked: "They did it again." There had been an attempted burglary at the club about one year previous, at which time the safe was battered. Defendant Shockley investigated that attempted burglary but no one was charged with it. The revolver belonging to one of the proprietors, Peter Albano, was the subject of investigation on a previous occasion and its serial number was taken at that time by another deputy sheriff (Keene). Albano told Shockley about the revolver being in the safe. Shockley called Keene to obtain the serial number. An identification officer arrived and photographed tire marks made by the car backing up to the front walkway. He started to photograph other tire marks nearby but was told by Shockley not to bother with them because they were just "routine tracks." He started to photograph certain footprints near the tire marks and Shockley told him not to do so because they were only footprints made by him (Shockley) and the proprietor.

About that time Deputy Sheriffs Keane and Waite arrived. They saw the footprints directly in front of the dining room entrance. Shockley was asked by these officers if photographs had been taken of these footprints. Shockley replied: "Yes." The heel prints were very clearly defined and close together. After other pictures were taken Shockley left and the other two deputies continued with their investigation. They found drill shavings near the place where the safe had been. Pictures were taken of the casings and doors where indentations were made by the jimmy.

On April 10, two scrap dealers found the mutilated safe a few miles east of San Bernardino near the city dump. They reported this find to Lieutenant White who accompanied defendant Shockley and the two scrap men to that area. When the safe was found the inventory, lease, a small punch, and three empty moneybags were also located near it. White saw some tire marks which he told Shockley appeared to resemble the tire tracks Shockley had previously described to him. Shockley replied: "No, that isn't it." The next day White saw the photograph of the tire marks taken at the Club

Towers and told Shockley he believed the tire marks he saw at the city dump were the same and suggested to him that he go out and check them. Defendant Shockley told him that he had done so that morning.

After a search of the area the safe was loaded into the sheriff's car by three men. On the way back one officer stated that whoever committed the burglary must have been pretty "hefty" and Shockley replied: "Any safe can be broken into. That one out at the Club Towers, it popped open like a cocoanut when you hit it with a sledge hammer." The property that was recovered was turned back to Albano. Albano asked Shockley if he had seen anything of the gun and Shockley replied in the negative.

On April 15, about 12:30 a.m. defendant Shockley was stopped in Riverside while driving alone in defendant Mercer's automobile and was taken to the police station by a police officer. The turtleback on the car was pried open. A kit of car tools, an electric drill, some clothing including a sweater and tennis shoes, a group of other tools such as chisels, punches, ball peen hammer, sledge hammer, etc. were found in it. There was a large plywood board lying horizontally on the spare tire which reflected deep gouges and scratch marks on its face. Pictures were taken of it as well as pictures of inked tire marks of the tires found on the car. Samples of debris found in the turtleback were taken. The photographs and many other articles were examined by the director of the Scientific Crime Investigation Laboratory. He made microscopic examinations and spectrochemical tests, exemplars, photographs, photosmicrographs and transparencies. He explained about his examination of the articles in detail. As a result he concluded that the indentations made on the plywood were made by the safe stolen from the Club Towers being "walked" across the board, and that the two kinds of paint found on the plywood board were similar in color and constituency to the rust-brown and blue-green paint found on the safe; that the four brackets from the safe all contained wood fiber contamination; that the center punch made the tool marks and holes on the safe plate; that the section of wire removed from the turtleback was contaminated with rust-brown paint of the same color and texture as the rust-brown paint from the safe; that the cord attached to the electric drill had a reddish-brown material on it similar in color and constituency to that found on the safe; that the right rear tire, which the People contended was in the turtleback at

the time, had reddish-brown paint on it of pigment similar to the shade of the reddish-brown paint on the safe; that the debris contained chips of paint characteristic of the paint found on the safe; that the cold chisel was contaminated with a *rust-brown* material similar in nature and principal elements to that found on the safe; that the pinch bar fitted the "moulage" cast of the jimmy marks on the club office door perfectly; that Mercer's sweater contained particles of paint similar to that on the safe; that a metal bit had been broken off in an effort to drill through the top of the safe, and that the hole appeared to have been made with a one-half inch bit. (The electric drill would have taken a one-half inch bit.) Photos of the peculiar tread of the tires corresponded quite favorably with the photo of the tire marks made at the Club Towers.

A chemist and engineer, called as an expert by the defendants, also examined the plywood board and the safe. He, too, stated that the marks made on the board were made by a bracket that came off of the front of the safe. He concluded that the top of the safe had been headed toward the front of the car while on the plywood board. The width of the turtleback of Mercer's car was 40 inches at its narrowest point and the length was about 44 inches.

An officer of the police department in Riverside testified that at the time of Shockley's arrest he asked him what he was doing cruising around that city at that hour of the morning and that Shockley replied that he brought a colored informant with him and was working on the "Winn murder case," helping a Riverside deputy named Vivian. Vivian testified that Shockley had not informed him of this fact and he did not know Shockley was in Riverside on that evening. At the trial Shockley changed his story and testified he went to Riverside with defendant Mercer and one Curry; that they had trailed a car to a certain home; that Mercer and Curry got out and he continued to follow the car but lost it just before he was apprehended.

Shockley's wife ran a private detective agency, the office of which was in Shockley's residence. In the filing cabinet of that office a deputy sheriff found the revolver stolen from the Club Towers. He asked Shockley if it was his gun and Shockley replied: "Yes, I bought it from a negro." When asked the Negro's name he stated: "He lives down on South Waterman." When later interviewed by the sheriff, Shockley stated he had lied to the deputies about buying the gun from

a Negro but that he had picked it up on April 11, while he and the other officers were searching the area where the safe was found; that it was then in a moneybag and that he hid it in his pants pocket out of sight. When asked ''Why?'' he stated: ''Well, I thought I could get away with it.''

On April 16, Mercer was questioned by the officers. He stated he was on duty on March 31, until about 5 a.m. of April first as a yard watchman at a night club in Colton; that he had his car with him at that place all of that night and had not loaned it to anyone. He admitted the car driven by Shockley on the 15th of April was his car and stated that he had never switched the tires.

After the preliminary examination, according to the evidence, Mercer asked the deputy what would be the outcome if he told him of eight or ten burglaries, and also asked the deputy district attorney what he could do if he (Mercer) admitted eight or ten burglaries. After some inquiry about how many burglaries defendant committed, he stated that if he told him it would implicate others and that he would rather not say anything; that as far as the Club Towers burglary was concerned, they had sufficient evidence and had produced such evidence at the preliminary hearing ''that he could not deny that burglary.'' He said that no doubt when it got to the superior court he would plead guilty.

The manager of the club where defendant Mercer was employed testified that about 9:30 p.m. on March 31, he called and inquired of Mercer as to who was out there with him; that Mercer replied ''Shockley,'' and that he (the proprietor) did not recall seeing Mercer after that hour on that evening.

Both defendants testified in their own behalf and denied the charges. Shockley said he found the gun, as previously related, but testified it was wrapped in a blue handkerchief inside of a bag and that it was then apparent to him it was Albano's gun; that he did not show it nor tell of finding it but took it home and placed it in the files ''until he checked on his own personal ideas as to his investigation.'' He admitted he made no check of fingerprints on the gun and did not report it to the sheriff's office or turn it over to the identification bureau for examination, as was the custom.

As to the tools, the electric drill, hammers, etc. found in defendant Mercer's car, which Shockley was driving, at the trial for the first time Shockley accounted for their presence in Mercer's car as follows: He testified that the next day after the safe was found he came home in the sheriff's car

which was generally assigned to him and told Mercer, who lived on the back of the lot, about finding the safe; that he asked Mercer if he would like to go with him and see where the safe was found; that they drove there in Mercer's car even though the sheriff's car was available to him if he was working on a case; that they searched the area and found this bundle of tools wrapped in a rug; that he dumped them on the plywood board in the turtleback of Mercer's car and told Mercer to lock the trunk; that he left them there because there was not sufficient room in the official car; that he never told the sheriff or any of his deputies about this find.

Both defendants, at the trial, denied generally and specifically the claimed conversations with the officers, professed their innocence of the charge and introduced evidence which, if believed by the jury, would have established an alibi.

The fact that the commission of a crime may be adequately established entirely by circumstantial evidence is not open to question. (*People* v. *Green,* 13 Cal.2d 37 [87 P.2d 821] ; *People* v. *Godlewski,* 22 Cal.2d 677 [140 P.2d 381].) The possession of the revolver stolen from the Club Towers was one of the important facts proving defendant Shockley's guilt. Admittedly, he gave a false explanation of the fact that he bought it from a Negro. Likewise, he was found in possession of the car which contained the tools which undoubtedly were used in the commission of the offense.

The law is established in California that possession of stolen property, coupled with false statements as to the manner in which the property came into defendant's possession, may be sufficient evidence to sustain a conviction of burglary. (*People* v. *Buratti,* 96 Cal.App.2d 417, 419 [215 P.2d 500].)

The question as to whether Shockley was telling the truth at the time of trial as to the manner in which he came into possession of the stolen property was solely for the jury. (*People* v. *Russell,* 34 Cal.App.2d 665, 669 [94 P.2d 400].) In view of the evidence here produced the jury was justified in rejecting Shockley's explanation of his possession of the stolen property. False and inconsistent statements made by Shockley, aside from those regarding his possession of the gun, indicate consciousness of guilt. (*People* v. *Cooper,* 81 Cal.App.2d 110, 117 [183 P.2d 67].) When questioned as to what he was doing in Riverside when picked up on April 15, he stated that he had brought a colored informant from San Bernardino. His story was later changed and he then ad-

mitted that he went to Riverside with defendant Mercer and one other. ■ The familiarity of Shockley with the burglarized premises is a circumstance which may be considered by the jury. (*People* v. *Bennett*, 93 Cal.App.2d 549, 552 [209 P.2d 417].) The jury had the right to believe that Shockley made the statement that "Any safe can be broken into. That one out at the Club Towers, it popped open like a cocoanut when you hit it with a sledge hammer." If true, this clearly points to guilty participation. Shockley's explanation of how the tools happened to be in Mercer's car is quite unsatisfactory. The evidence clearly shows that the safe was placed in the back of Mercer's car and that.the tools there found were used in the commission of the burglary. The direction of Shockley to the photographer not to take a photograph of certain tire tracks and certain footprints at the scene of the crime which defendant Shockley conceded were his footprints and those of the proprietor, and falsifying about photographs having been made of them, may be considered quite inconsistent with the actions of an innocent man.

■ We conclude that the facts related sufficiently tend to connect both Shockley and Mercer with the commission of the crime and are sufficient to support their convictions. (*People* v. *Colletta*, 100 Cal.App.2d 1 [222 P.2d 922]; *People* v. *Lloyd*, 98 Cal.App.2d 305 [220 P.2d 10]; *People* v. *Lyle*, 91 Cal.App.2d 45 [204 P.2d 356]; *People* v. *Bisbines*, 132 Cal.App. 239 [22 P.2d 762]; *People* v. *Taylor*, 4 Cal.2d 495 [50 P.2d 796]; *People* v. *Flynn*, 73 Cal. 511 [15 P. 102]; *People* v. *Godlewski*, 22 Cal.2d 677 [140 P.2d 381].)

As to the claimed alibi, defendant Shockley and Mrs. Mercer testified that Shockley was in bed on March 31, at 9 p. m. in his home. Mrs. Shockley testified that she came home about 1 a. m. on April 1st accompanied by another woman and that her husband was in bed at that time and that she slept with him until 5 a. m., at which time she returned to Barstow.

It is defendant Mercer's contention that he was employed at the parking lot that entire night. ■ The question whether or not the defendants sufficiently established an alibi under the evidence was a factual question for the determination of the jury. ■ The burden is upon the defendants to prove their alibis to such a degree of certainty as would, upon a consideration of all of the evidence, leave a reasonable doubt of defendants' guilt in the minds of the jury. (*People*

v. *Peterson,* 66 Cal.App.2d 420, 423 [152 P.2d 347] ; *People* v. *Lyle,* 91 Cal.App.2d 45, 49 [204 P.2d 356].) ■■ The jury having found against the defendants' claimed defense of alibi, such finding cannot be disturbed on appeal. (*People* v. *Alexander,* 92 Cal.App.2d 230 [206 P.2d 657] ; *People* v. *Cannon,* 77 Cal.App.2d 678 [176 P.2d 409] ; *People* v. *Huizenga,* 34 Cal.2d 669 [213 P.2d 710]. )

The next complaint·pertains to an instruction proposed by the prosecution and modified by the trial court. It reads in part:

"You are instructed that a conviction for burglary may be had on circumstantial evidence, although no witness actually saw the defendants break and enter the burglarized premises, or saw them in that vicinity about the time the burglary was committed, (if you find that the defendants did break and enter the burglarized premises, or if you find that the defendants were in that vicinity about the time the alleged burglary was committed.)" [The portion in parentheses added by the court.]

The argument is that the instruction, as modified, advised the jury that it was not necessary for a witness to actually see the defendants break into and enter the burglarized premises but it was sufficient if they believed that the defendants or either of them "were in the vicinity" about the time the burglary was committed. The added portion may well have been omitted as it tended to confuse the statement of law set forth in the first portion thereof which specifically instructed the jury that a conviction for burglary may be had on circumstantial evidence although no witnesses actually saw the defendants break and enter the premises or actually saw them in the vicinity about the time the burglary was committed. The defendants testified that they were not in the burglarized premises or in the vicinity thereof about the time the burglary was committed. The circumstantial evidence not only placed them in the vicinity of the burglarized premises but also established the fact that whoever burglarized the premises were actually in the premises. The jury was otherwise instructed that if it believed from the evidence beyond a reasonable doubt that the defendants wilfully and feloniously entered the building occupied by the Club Towers with intent thereby and therein to commit the crime of theft then it should find the defendants guilty of the crime of burglary as charged. The jury was also instructed in the lan-

guage of CALJIC Instruction No. 201, page 153, to the effect that every person who enters any shop or other building with intent to unlawfully steal the personal property of another is guilty of burglary and that the essence of the burglary is entering a place with such specific intent, and that the crime is complete as soon as the entry is made.

 A single instruction or a portion of an instruction cannot be considered separately from the entire charge. (*People* v. *Frazier,* 88 Cal.App.2d 99 [198 P.2d 325].)

From a consideration of the entire instructions given on the subject it is apparent that the defendants were found guilty by the jury of breaking and entering the premises with intent to commit theft and not merely of being in the vicinity thereof. No prejudicial error resulted.

The motion for new trial predicated upon these same grounds was properly denied. Judgment and order denying a new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.