[Crim. No. 829. Fourth Dist. May 16, 1951.]

THE PEOPLE, Respondent, v. WARREN ARTHUR GOODALL et al., Appellants.

J. M. Lopes for Appellants.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendants were convicted by a jury of the offense of burglary of a building occupied by the Tulare-Kings Counties Trades Council, in Visalia, on the night of July 28, 1950. Defendant Goodall admitted a prior conviction of burglary.

The Trades Council building was partitioned into three sections. The front section was a waiting room containing a desk and chairs. The middle section was the business office, which contained a safe measuring 22x23x33 inches, and weighing about 420 pounds, in which had been left $97 in cash and money orders and some 1949 union dues "stamps" similar to small postage stamps. The third section was a meeting hall.

Shortly before the burglary, the defendant Goodall joined a trades council union. On the night of July 28th at about

10 p. m. Goodall and defendant Dean drove to the front of the building, inquired as to where a certain union meeting was being held, entered the front office, looked around, and after a while they drove away in Goodall's 1938 maroon-colored convertible Ford. The hall doors were locked about 10:15 p. m. The next morning, upon entering the office, one of the union officials saw broken glass from a window, a door had been pried open, the safe removed and track marks on the floor indicated something heavy had been removed through the back door. Immediately outside the rear door, near the alley, were automobile tire-track marks indicating a car had been backed up to the door. A photographer took photographs of the tire marks made by the right and left rear tires.

Goodall was awakened at his home, arrested, and ordered to drive the officer in his 1938 maroon-colored convertible Ford to a parking lot near the police station. Photographs were taken of it as well as the left and right rear tire-mark impressions that were made on white paper. Under the front seat two chisels were found. On the seat was a folded blanket and, when unfolded, six loose union "stamps," similar to those left in the safe, were found. Some foreign grayish paint was adhering to the bottom part of the trunk of the car and a sample was taken. Weeds were removed from the undercarriage of it. There was a small cardboard box of tools in the trunk. There was evidence of two indentation markings on the lid of the turtleback about 22 or 23 inches apart, evidently made by a sharp-cornered object. Samples were taken of the dirt found on the front-seat floor boards as well as on the floor of the trunk. All of these exhibits were forwarded to the FBI laboratory for analysis.

When Goodall was arrested, a probation officer, who was at the police station, recognized him. Goodall pretended he did not know the probation officer who had been previously informed about the case. He asked Goodall "if he was guilty" and Goodall said: "Well, ask Floyd (the arresting officer). He knows." He then asked Goodall why he did not "cop out" (plead guilty) and get it over with and Goodall said "Why should I? I know all about the safe, but I am going to have some fun out of this."

In the conversation with the chief of police and others, Goodall was asked to tell of his whereabouts and movements on the night of July 28th. He stated he was out with defendant Dean, drove to Tulare in the above-mentioned Ford, and returned to Dean's home about 11 p. m., played some cards

until 2 a. m. and then they decided to go fishing; that they went to one Mitchell's house, awakened him, and borrowed his equipment and drove out to the "East Fork" near a bridge; that it was about daylight at that time and they decided they did not want to fish so they turned back and went to their respective homes to bed.

Defendant Dean was apprehended and asked the same questions. His story was substantially the same as Goodall's except he stated that when they arrived at Mitchell's home about 1:30 a. m. Mitchell was not interested in going fishing so they all sat around and played cards until 3 a. m. and they then returned home.

He was specifically asked if they went fishing and he said that they talked about it but did not go. Dean asked what punishment he could expect if he were implicated and the chief told him that he was in no position to make any promises; that it was strictly up to the court, but in view of the fact that he had no previous record he might be able to get probation; that the offense could be punishable by a jail sentence. The chief then went to the outer office, obtained a copy of the Penal Code, opened it to the section on burglary and let him read the section, which he did. Later, when confronted with the discrepancies in their two stories about fishing, Goodall stated: "If Dean said we went fishing, I must have gone by myself." Neither defendant ever mentioned about going to the Trades Council's office that evening

In Goodall's billfold was a combination of numbers written upon a paper which might well indicate that they constituted a combination to a safe. He was questioned about these figures and he stated: "That is no safe combination"; that someone had written it out and given it to him; that he did not know who it was. Also found on him was a drawing or diagram of a building resembling, to some extent, the arrangement of the Trades Council building. When asked what it was he stated he did not know, but "some guy" drew it and gave it to him.

On July 30th two hunters found the battered safe under a bridge two miles east of Visalia. The bottom of the safe had been torn open and a peculiar form of cement used therein had been crumbled and was exposed to observation. Samples of the cement and paint on the safe were taken. The contents of the safe were missing. Several of the "1949 Union stamps" were scattered about. Faint tire marks indicated a car had been driven to that point. Scratches were noticed on

the railing of the concrete bridge and marks indicated the safe had been dragged under it. The safe was brought to the court and admitted in evidence as an exhibit.

Two FBI investigators, assigned to the laboratories at Washington, D. C., after qualifying as experts, testified and gave as their opinions that the chisel found in the Ford fitted perfectly into an indentation made in the safe insulation cement; that the cement particles found on the chisel were of the same peculiar texture as that found in the safe; that the tire marks of the left and right rear tires in the photographs were the same as the photographs of the tire marks of the car made at the Trades Council building; that the foreign paint found in the trunk of the car had the same metallic composition and color as the paint from the safe and that the particles of paint found on the front and trunk floor boards were comparable to particles of the cement insulation found in the safe.

The defendant Goodall, in testifying in his own behalf, admitted his previous conviction of a felony and said he sat at the Mitchell house until 3:30 that night, did not go out to the bridge to fish but only talked about it. When asked why he did not mention about going to the Trades Council building that evening he said: "It was just a minor thing, I never even thought about it. I was only there three or four minutes and was gone." He stated the paper found was not a combination to a safe but was probably some figures he took or made in connection with his work with the gas company, such as "property measurements." He said the chisels found in his car were some he used in connection with his work. He denied the conversation claimed to have been related to the probation officer, denied any knowledge of or participation in the crime and produced his relative witnesses indicating he was home at the hours indicated and was at Mitchell's home until about 3:30 a. m.

Defendant Dean related about the same story, denied he knew anything about the crime, denied the conversation with the chief or seeing the Penal Code, and produced relative witnesses (the Mitchells) corroborating his story about being at their home at the hours indicated by Dean.

Defendants first question the sufficiency of the evidence to support the verdict. They do not question the fact that a burglary was proved. It is their contention that the evidence upon which their convictions were based was all circumstantial and was insufficient to convict them of the charge.

■ A finding of guilty may be based upon circumstantial evidence. (*People* v. *Mercer*, 103 Cal.App.2d 462 [229 P.2d 411]; *People* v. *Mercer*, 103 Cal.App.2d 782 [230 P.2d 4]; *People* v. *Green*, 13 Cal.2d 37, 42 [87 P.2d 821]; *People* v. *Koenig*, 29 Cal.2d 87, 91 [173 P.2d 1]; *People* v. *Kittrelle*, 102 Cal.App.2d 149, 157 [227 P.2d 38].)

■ That defendant Goodall's car was used in carrying away the safe appears to be well established, as indicated, particularly through comparison of tire tracks with the tires on his car, the damage to the "turtleback" of his car and marks on its turtleback door; through a comparison of paint found in and upon his car with that on the safe; by comparison of the chisels found in his car with marks found on the safe; and by comparison of particles of cement and paint found on the chisels which undoubtedly came from this very safe; also, the fact that "stamps" which could only have come from inside the safe, were discovered in Goodall's car by investigating officers. Defendant Goodall did not explain the presence of these stamps in his car but only denied any knowledge thereof. Even in the face of this denial the jury could well infer that Goodall had knowledge of these items. (*People* v. *Torres*, 98 Cal.App.2d 189, 193 [219 P.2d 480]; *People* v. *One 1940 Chrysler*, 77 Cal.App.2d 306, 311 [175 P.2d 585].)

■ Where one is found to be in possession of stolen articles, it may be presumed not only that he stole them but also made use of the means by which access to them was obtained. Such evidence, when coupled with the equivocal statements as to defendants' whereabouts that night, the comparison of tire marks, the unsatisfactory explanation of possession of some of the stolen goods, and other evidence here shown, may well support a burglary conviction. (*People* v. *Lang*, 142 Cal. 482 [76 P. 232]; *People* v. *Platnick*, 71 Cal.App.2d 767 [163 P.2d 766]; *People* v. *Russell*, 120 Cal.App. 622 [8 P.2d 209]; *People* v. *Kittrelle, supra*; *People* v. *Colletta*, 100 Cal.App.2d 1, 4 [222 P.2d 922].)

■ Where the burden of establishing an alibi is not met, and the asserted alibi is defective because of false and inconsistent statements, the trier of fact is justified in rejecting the defense because such proof must be so certain and convincing as to raise a reasonable doubt in the minds of the jury. (*People* v. *Alexander*, 92 Cal.App.2d 230, 234 [206 P.2d 657]; *People* v. *Alexander*, 78 Cal. App.2d 954, 958 [178 P.2d 813]; *People* v. *Ash*, 88 Cal.App.2d 819, 825 [199 P.2d 711].)

██ As to defendant Dean, the evidence shows that he was with Goodall the entire evening and both were familiar with the premises after their visitation to it that same evening. This is a circumstance which may be considered by the jury. (*People* v. *Flynn,* 73 Cal. 511 [15 P. 102].) The circumstances in connection with his complicity show that a safe weighing 420 pounds, requiring the strength of at least two men to lift, was removed from the office through a rear door and placed in a waiting automobile. This indicates that someone other than Goodall participated in removing the safe. (*People* v. *Mercer, supra* [103 Cal.App.2d 782].)

The testimony of both defendants precludes the theory that any person, other than Dean, was Goodall's partner in this crime. It should also be noted that Dean found it convenient to withhold the fact that he had been to the Trades Council hall that night. He also denied that he went to the bridge with Goodall to go fishing. Yet his own mother testified that he came home about 11 p. m. and changed his clothes to go fishing. The jury was entitled to infer from this evidence and the admissions made that defendants never intended to go fishing but were prefabricating an alibi in case they were seen near the bridge where the safe was abandoned. As to this fishing trip, both defendants made inconsistent statements.

The jury might well infer that since Dean inquired as to the punishment for the crime and read the Penal Code he was struggling to decide whether to plead guilty or stand trial. (*People* v. *Hurst,* 108 Cal.App. 24, 25 [290 P. 887].) These inferences are strengthened by the fact that neither defendant admitted that he was at the Trades Council hall that evening until the prosecution proved the fact by eyewitness testimony at the trial.

We have enumerated the salient circumstances as they presented themselves to us and as a result thereof we are of the opinion that the circumstances reasonably justify the conclusion of the jury as expressed in its verdict. (*People* v. *Martinez,* 31 Cal.App. 413 [160 P. 868]; *People* v. *Mattmueller,* 30 Cal.App.2d 532 [86 P.2d 838]; *People* v. *Bisbines,* 132 Cal.App. 239 [22 P.2d 762]; *People* v. *King,* 4 Cal.App.2d 727 [41 P.2d 593].)

██ The main contention of defendant Goodall is that the court prejudicially erred in allowing in evidence the slip of paper containing the numbers indicating a safe combination. It is true that there was no evidence in the record showing that it was the combination to this particular safe. The

defendant admitted the figures might have been made by him in figuring the size of the property in connection with his work. The figures read generally: 1-40 left; 1-3-40 right; 1-1-25 left; 1-1-92 right. Whether defendant's explanation of these figures was a proper one, and whether the figures were of property measurements were questions for the jury to determine. No prejudicial error resulted. (*People* v. *Pianezzi*, 45 Cal.App.2d 576 [114 P.2d 601]; *People* v. *Owens*, 79 Cal.App.2d 290 [179 P.2d 401]; *People* v. *Bashaw*, 80 Cal.App.2d 974 [183 P.2d 41].)

The next complaint is that the court erred in instructing the jury on matters of law. Counsel for defendants failed to point out the instructions claimed to have been erroneously given, and has failed to discuss this point or cite any supporting authorities in his brief.

 It is the duty of the defendants to show error, and that means defendants are under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent. (*People* v. *Shafer*, 101 Cal. App.2d 54, 60 [224 P.2d 778]; *People* v. *Daniels*, 85 Cal.App. 2d 182, 185 [192 P.2d 788].)

Lastly, it is claimed that the court erred in not granting defendants' motions for new trial. No grounds are stated for reversal of this ruling other than those already discussed. We have read the entire record and have fully examined the instructions, both given and refused. There was sufficient evidence, if believed by the jury, to support the verdicts. No prejudicial error appears. There is no showing that the jury was not fully and properly instructed. There was no abuse of discretion in denying the motions for a new trial. (*People* v. *Chavez*, 100 Cal.App.2d 214, 219 [223 P.2d 44].)

Judgment and orders denying new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.