[Crim. No. 2853. First Dist., Div. One. Apr. 13, 1953.]

THE PEOPLE, Respondent, v. WILLARD WAYNE, Appellant.

Harrison W. Call for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Wallace G. Colthurst, Deputy Attorney General, J. F. Coakley, District Attorney (Alameda), Richard H. Chamberlain, Assistant District Attorney, and Ray Mellana, Deputy District Attorney, for Respondent.

BRAY, J.—Defendant appeals from a judgment on jury verdicts, convicting him on three counts, and from an order denying a new trial.

### QUESTIONS PRESENTED

1. As to count one, was May an accomplice of defendant, so as to require corroboration of his testimony?
2. Sufficiency of evidence as to all counts.
3. Alleged errors in admission and rejection of evidence.
4. Alleged misconduct of court and district attorney.
5. Alleged error in instructions.

### RECORD

Defendant Wayne and one Redden were jointly indicted on three counts: One—violation of section 653f, Penal Code, by soliciting Joseph May to offer and join in the offer of a bribe to Alameda police officials to influence them corruptly in the investigation and arrest of said May for violating

section 337a, Penal Code (bookmaking). Two—violation of subdivision 1 of section 337a, Penal Code, in that they engaged in pool selling and bookmaking. Three—violation of subdivision 2, section 337a, Penal Code, in keeping and occupying a room with paraphernalia for recording bets on horse races. Redden pleaded guilty to all three counts and applied for probation. From time to time the determination of his application was continued beyond Wayne's trial. Prior to the arrest of defendant and Redden, May was arrested on a separate charge for bookmaking. He pleaded guilty and was placed on probation which included a county jail farm sentence. Defendant Wayne was found guilty on all three counts. His motion for new trial was denied.

### EVIDENCE

Although the reporter's transcript consists of 1355 pages, the case is based primarily upon the testimony of May and Redden as opposed to that of defendant. Generally, the two testified that May, who was then on probation for bookmaking, suggested to Redden that he contact someone who could arrange police protection in the city of Alameda so that May could operate bookmaking there. Redden contacted defendant and explained the situation. Later defendant informed Redden that he had contacted a certain police lieutenant who said the protection could be arranged. Redden then invited defendant to meet May at Redden's home. At that meeting May explained how much book he was taking in. After some discussion May and defendant agreed that defendant was to receive 20 per cent of the net take of the book for the payoff, as a starter to see how it would go. This money was to be split three ways, the police getting one part, Redden and defendant each one part. It was to be paid by May to Redden who was to give it to defendant. Defendant stated that he would have to tell the police that he was to be May's partner as they did not let everybody come into Alameda. He also explained the conditions of operating required by the lieutenant. Defendant left saying that he would contact the police to see if the location May had proposed would be satisfactory and then would let Redden know. Defendant later phoned Redden that the location was all right. May started operating in late September, 1950. November 28th, Redden phoned May to come to his home as the matter was important. Defendant was there and stated that May "was supposed to be knocked off between the hours

of two and three" that afternoon; that a teletype came into the police station from the sheriff's or district attorney's office to have May picked up; that one officer laughed and said "Look what we have here." The lieutenant grabbed the message and said, "I will take care of it myself." He then tried all afternoon to locate defendant to tell him of this, had called May's office a couple of times, and left word with defendant's wife for May to "stop taking music lessons." The office where May was operating his book was ostensibly a school of music. Defendant said "we will have to close down." They decided to move out that night. May, being on probation, was afraid to go down to the book as he thought the police might be watching the place. Defendant said he would go down to police headquarters and find out if there were any lookouts and would phone back. In 20 or 30 minutes he phoned that there were no watchers and for them to go down and move out the equipment. This May and Redden did in Redden's car. A little later a new location was chosen. Defendant stated that the lieutenant was very angry when he learned that the operator of the place was a man who was on probation and that he had told the lieutenant that he personally had lost $4,500 in the operation. Defendant said also that the police were unhappy with the amount they had received under the 20 per cent deal and wanted $100 a week or 20 per cent of the take if it ran over that amount. May opened up the new place on those terms. Redden bought an interest in the book there. Under the first arrangement, May only paid $17 for the first week. Defendant then suggested that Redden check May's books. While operating at the first location May paid Redden "Something like $500, it could have been $550, and it could have been $475." While operating at the new location May paid Redden about $300. Defendant gave a case of whisky to the lieutenant, a slot machine to one of the police, and a couple of cases of whisky to other policemen. After deducting the cost of these, defendant and Redden split the balance evenly. On January 12, 1951, May was arrested for bookmaking. The lieutenant took Redden down to police headquarters. On the way he told Redden that May claimed to have been paying Redden and defendant money to give to him. He asked Redden what he was going to tell at headquarters. Redden said he would say that May was paying off a loan to defendant. The lieutenant said, "Well, I guess that story is as good as any." The lieutenant

took Redden in to the chief of police. May was brought in. Redden then asked May if he did not borrow $1,000 from defendant and May replied that he did. On leaving the chief's office the lieutenant asked Redden to get in touch with defendant as soon as possible and let the lieutenant know. Redden learned from defendant's wife that defendant was on his way to Sacramento and that he could be reached at the Senator Hotel there after 8 o'clock. Redden phoned the lieutenant that he was going to call defendant and would get his phone number for the lieutenant since the latter wanted to talk to him. Redden did give the lieutenant defendant's number. Redden phoned the hotel and left word for defendant to call him. Defendant called later and Redden told him of May's arrest, and then, or when he saw defendant two days later, Redden told him about telling the police the story about a loan from defendant to May. Defendant stated that he would get an attorney for defendant and Redden. This he did and the two of them were in the attorney's office together. This attorney represented them both on this indictment.

### DEFENDANT'S TESTIMONY

Defendant's business, among other things, was servicing slot machines at an Alameda club, where he met the lieutenant and several other police officers. He had visited at the lieutenant's home and the latter at his. He admitted getting a slot machine for one of the police officers. Defendant denied that he had ever agreed to receive or received any money from May or Redden for police protection or for payments from a book. His version was that Redden had asked him if he would lend a friend of his $1,000 repayable $100 a week for 12 weeks. On being told that he might, Redden told him to bring the money over to Redden's house when he brought a television set that defendant was selling him. When he got to the house a man was there whom Redden introduced as "Joe." Redden said, "you fellows make your own arrangements." Defendant said that he understood he was to be paid back at the rate of $100 per week plus $200 interest. May said that he would do his best to pay it back at that rate. If it was "a little light" one week he would make it up the next week or over the period of a month, it would average $100 per week. Redden suggested that May could leave the money each week and he would give it to defendant. Redden had told defendant that May had a restaurant and

was a responsible person. Defendant gave May the money in cash. He had kept it at home in a locked metal cigar box. Defendant took no receipt or note from May for the money. After May left defendant asked Redden what type of restaurant May had and was told it was a small 20-stool restaurant, although Redden said he had never been in it. Defendant then said that it was odd that a man with only a small restaurant could make the payments he had promised. Redden then told him that May "runs a little bookie place in his restaurant." Defendant stated that he had received a total of $850 on the loan. He kept no record of payments "other than a few times I have a calendar over my bench, and a few times I have jotted down the balance that was owing me, but I never kept a methodical record of it or any business-like record of it." He was unable to find the calendar. In a prior statement given a deputy district attorney defendant stated that the only record he kept was in his head and also that Redden had told him prior to his making the loan that May was "probably doing a little bookmaking on the side." Defendant did not know that May had been arrested before. In November there was an article in the paper about May being given probation. He phoned Redden that he was uneasy about the situation and that May should stick to the restaurant business as he surely would be caught. A day or so later at Redden's house he told May that he read in the papers that an extensive drive was being made on bookmakers in Alamenda and that he was foolish to be engaged in such business in a town the size of Alameda. (Although defendant disagrees with May and Redden as to the date, this is the conversation in which they claim he told them about the teletype and advised immediate closing.) In his statement to the district attorney he claimed that the reason he told Redden and May to close down was because of the Kefauver investigation. Before the grand jury defendant, on advice of his counsel, claimed his privilege not to testify. Defendant admitted calling Redden from Sacramento on the night of May's arrest. This, according to the hotel records, was at 8:41 p. m. At 1:39 a. m. following, he received a call from "Willie Smith" from Oakland, who had previously asked defendant to get him a job. Smith called to say that "he was on his way, that he was going to Los Angeles." The records show that this call came from a public phone booth. When the police raided the premises where May was con-

ducting his book there was an abundance of equipment and paraphernalia to show that bookmaking was going on there.

### ACCOMPLICE

As to the second and third counts, the court fully instructed concerning accomplices and the necessity for corroboration of them. As to count one the court instructed that as a matter of law Redden was an accomplice of defendant, but that under section 653f of the Penal Code "the person solicited cannot be prosecuted for soliciting the offer of a bribe, and therefore is not an accomplice." This instruction, considered with the instructions on corroboration, told the jury, in effect, that May was not an accomplice and his story did not need to be corroborated, hence the jury could convict on May's testimony alone. *People* v. *Coffey,* 161 Cal. 433 [119 P. 901, 39 L.R.A.N.S. 704], held that the definition of an accomplice under section 1111, Penal Code, which then contained no definition, was the same as at common law and in the federal courts, and that the true test and rule was "If in any crime the participation of an individual has been criminally corrupt he is an accomplice." (P. 448.) That is no longer the rule, for subsequently section 1111, Penal Code, was amended providing the present definition: "An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." In *People* v. *Shaw,* 17 Cal.2d 778, 781 [112 P.2d 241], it was charged that the defendants " ' "did . . . aid and abet, advise and encourage, and by threats, menaces, command and coercion, compel and cause . . ." ' " one Gravatt, who was the manager of the civil service department of the city of Los Angeles, and other employees in the civil service department, to alter and falsify certain civil service records then in the custody of Gravatt and the other employees. In holding that Gravatt was the accomplice of the defendants the court quoted section 1111 as amended and stated (p. 799): " 'Quoting from 8 California Jurisprudence 173: "The word 'accomplice' has been defined as including all persons who have been concerned in the commission of an offense." [Citations. Of the citations given here, *People* v. *Kraker,* 72 Cal. 459 [14 P. 196, 1 Am.St.Rep. 65], *People* v. *Ruef,* 14 Cal.App. 576 [114 P. 48, 54], and *People* v. *Bunkers,* 2 Cal.App. 197 [84 P. 364, 370], were prior to the amendment to section 1111, while *People* v. *Kinsley,* 118 Cal.App. 593 [5 P.2d 938] ; and *People*

v. *Frahm,* 107 Cal.App. 253 [290 P. 678], were subsequent, and quoted the definition given in that section.] In other words, one is an accomplice who knowingly, voluntarily and with common intent with the principal offender unites in the commission of the crime. [Citations. Here the court cited *People* v. *Bolanger,* 71 Cal. 17 [11 P. 799], decided prior to the amendment, and *People* v. *Davis,* 210 Cal. 540 [293 P. 32] (refers to the section) and *People* v. *Howell,* 69 Cal.App. 239 [230 P. 991] (quotes the section as amended), decided subsequently.] In several cases, the courts derived a definition from the language of section 31 of the Penal Code, holding that accomplices are all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present, have advised and encouraged its commission. [Citations. Cited are *People* v. *Coffey,* 161 Cal. 433 [119 P. 901, 39 L.R.A.N.S. 704], *People* v. *Collum,* 122 Cal. 186 [54 P. 589], *People* v. *Lawlor,* 21 Cal.App. 63 [131 P. 63], and *People* v. *Moran,* 144 Cal. 48 [77 P. 777], all decided prior to the amendment.]' ''

In *People* v. *Lima,* 25 Cal.2d 573 [154 P.2d 698], the defendant was charged with buying stolen olives from Amos and Larkin, who admitted they stole them. The principal question presented was whether the thieves were accomplices of defendant as receiver of the stolen property, so as to require corroboration of their testimony. The court stated (pp. 576, 577, 578) : ''It is now settled in this state that the thief and the receiver of stolen property are not accomplices . . . And conversely, it has been said that inasmuch as a thief cannot receive from himself, he cannot be an accomplice of the receiver. The thief and the receiver are therefore generally said to be guilty of separate and distinct substantive offenses, and not being 'liable to prosecution for the identical offense' are not accomplices within the meaning of that term as defined in section 1111 of the Penal Code. There is, however, a well-established exception to this general rule. The rule and the exceptions are stated in 2 Wharton's Criminal Evidence 1248-1250, section 741, where it is said that '. . . an exception to this general rule has ensued where the thief and the receiver of stolen property conspire together in a prearranged plan for one to steal and deliver the property to the other, and pursuant to such plan one does steal and deliver to the other; it is held in this case that the receiver is an accomplice of the thief, and the thief is an accomplice of the receiver . . .'

. . . [Citations follow.] When there has been a conspiracy or prearranged plan between the thief and the receiver, the conspirators have been held to be accomplices even where, as is necessary under our statutory definition of accomplices (§ 1111, *supra*), the test is whether they are liable to prosecution for the identical offense or offenses. . . . In our opinion, reason supports the exception recognized in the cited cases and texts. An accomplice has been defined as one 'who knowingly, voluntarily and with common intent with the principal offender unites in the commission of the crime.' (*People* v. *Shaw*, 17 Cal.2d 778, 798, 799 [112 P.2d 241]; *People* v. *Wilson*, *ante*, p. 341 [153 P.2d 720].) Where, as here, the prosecution evidence discloses the existence of a conspiracy or agreement whereby the principal prosecution witnesses were to steal and defendant was to purchase the stolen property, it is both logical and reasonable to hold that they are accomplices in the offense or offenses resulting from execution of such plan. If we were to allow the conspiracy element to be disregarded and the accomplice relationship thereby eliminated, the prosecution could circumvent the rule requiring corroboration of accomplice witnesses. We conclude, therefore, that Amos and Larkin, the principal prosecution witnesses, by virtue of their admissions must be held to be accomplices whose testimony, standing uncorroborated, will not support defendant's conviction.''

While it is true that May, by asking Redden to find someone who could obtain police protection for him, started the chain of circumstances culminating in the crime charged, the evidence justifies the conclusion that the three, May, Redden and defendant, conspired together to join in the offer of the bribe. For that reason it is not necessary to discuss the technical differences between a solicitor and a solicitee. In the first meeting between defendant and May the former told May he could insure him for protection for $200 per week. Defendant further stated that the police who were to get a part of that money would be told that defendant was a partner in the enterprise. While at first blush it may seem unusual to state that one can solicit himself, it must be remembered that here May was no innocent member of the triangle. It was not the usual situation where persuasion has to be used to get the solicitee to accept the solicitation, as was the case in *People* v. *Haley*, 102 Cal.App.2d 159 [227 P.2d 48], and *People* v. *Baskins*, 72 Cal.App.2d 728 [165 P.2d 510], where it was held that one cannot solicit himself to commit a crime.

Here May actively aided and abetted defendant. As said in *People* v. *Shaw, supra,* 17 Cal.2d 799, he "knowingly, voluntarily and with *common intent with the principal offender*" (p. 799, emphasis added) united in the commission of the crime.

A conspirator adopts the acts of his fellow conspirator. The prosecution established a conspiracy of May, Redden and defendant to bribe. This was the major conspiracy. Prior thereto defendant and Redden conspired to bribe and one of the acts done in furtherance thereof was the solicitation of May. May joined this conspiracy to bribe, in fact was an active participant in it. Hence he could be held liable for his own solicitation. "If we were to allow the conspiracy element to be disregarded and the accomplice relationship thereby eliminated, the prosecution could circumvent the rule requiring corroboration of accomplice witnesses." (*People* v. *Lima, supra,* 25 Cal.2d 573, 578.) See, also, *People* v. *Wallin,* 32 Cal.2d 803 [197 P.2d 734], where the court held the person committing the murder was the accomplice of the defendant charged with the crime of being an accessory to the murder, and *People* v. *Young,* 132 Cal.App. 770 [23 P.2d 524], where it was held that a female who assisted in the commission by the defendant of the offense of pimping could be prosecuted for that charge although the statute defining the crime refers only to a male person. Also in *People* v. *Bartol,* 24 Cal.App. 659 [142 P. 510], it was held that a woman who aids a rapist may be charged with rape. Surely, if it can be held, as it was in the Shaw case, that a person who alters the books of a city is an accomplice of the person who aided, abetted, advised, encouraged, compelled and caused him to do such altering, and as in the Lima case, that the thief is an accomplice of the receiver of stolen goods, it is reasonable to hold that under the conspiracy shown in this case, May was an accomplice of defendant. Being such accomplice, defendant was entitled to an instruction that May's testimony must be corroborated. The failure to so instruct was error and prejudicial error, even though, as we will point out later, there was corroboration as to the crimes charged in the second and third counts. Under the evidence, proof of bookmaking and keeping a room for bookmaking purposes did not necessarily prove the soliciting to bribe charge. The jury as to that charge may have relied on the testimony of the accomplices alone.

SUFFICIENCY OF EVIDENCE

Defendant's contention in this respect as to counts two and three is that there is no corroboration of the testimony of May and Redden, who admittedly under their testimony were accomplices of defendant. The equipment and paraphernalia found by the police when they raided May's place amply demonstrates that he was engaged in bookmaking there and that the place was occupied for that purpose. The testimony of May and Redden amply substantiates the finding that defendant aided and abetted in the operation there. In determining the sufficiency of the other evidence necessary to corroborate an accomplice, "there are certain established legal principles that serve as guides. It must 'tend to connect the defendant with the offense,' but 'So long as corroborating evidence creates more than a suspicion of guilt, it is sufficient even though it "be slight and, when standing by itself" entitled to but little consideration.' [Citations.] The necessary corroboration may consist of inferences from the circumstances surrounding the criminal transaction. [Citation.] It need not establish the precise facts testified to by the witness whose testimony it supports. (*Ibid.*) It is not necessary that the corroborative evidence prove the defendant is guilty of the offense. [Citation.] Such evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the trier of fact that the witness whose testimony it supports is telling the truth. [Citations.] . . . *'Whether the corroborating evidence by itself is as compatible with innocence as it is with guilt, is a question for the trier of fact, not for the reviewing court.'* (Italics added.) [Citations.]" (*People* v. *Kendall,* 111 Cal.App.2d 204, 210 [244 P.2d 418].)

Applying these principles, it cannot be said as a matter of law that the corroborative evidence in this case is insufficient. "The relationship of the men and all their acts and conduct . . . are corroborating circumstances." (*People* v. *Henderson,* 34 Cal.2d 340, 343 [209 P.2d 785].) The following matters constituted sufficient corroboration. Perhaps no one of them, taken alone, would be sufficient, but taking them together they make a strong circumstantial case of defendant's interest in May's bookmaking business. Defendant had more than a speaking acquaintance with at least five important members of the police department. The telephone calls between Redden and defendant on the day of

May's arrest. Mrs. Wayne testified to three phone calls from Redden for defendant that afternoon, two before and one after defendant left for Sacramento. Then Redden's call to Sacramento and defendant's answering call that night. The call to defendant at 1:39 the following morning from the mysterious Willie Smith and defendant's rather tenuous explanation of it. The call came from an East Oakland pay station. The police lieutenant, who Redden testified had asked how to get in touch with defendant that night, got off duty shortly before that call and at a distance not great from the pay station. Defendant's story of the alleged loan to May. On Redden's assurance alone that May was all right, he made a loan of $1,000 to a man whose business he did not know until after he made the loan, according to his statement at one time. He took no receipt or note, and thereafter kept no records of payments other than on an elusive calendar. As far as aiding and abetting in the operation and maintenance of the book is concerned, the defendant's own admission at one time that prior to making the so-called loan Redden informed him May was operating a book, and defendant's then making a loan, obviously intended to be used in that racket, defendant to receive 20 per cent interest on a 12 weeks' loan, which interest obviously could only come from one source,—go a long way toward corroborating the testimony of May and Redden. A captain in the sheriff's office of Alameda County testified that on November 27, 1950, he informed by phone an inspector of the Alameda Police Department that he had information that May was apparently operating in the city of Alameda, giving him May's address (May's so-called School of Music). In addition the captain mailed to the inspector a memo of the matter. This was the day when, under May's testimony, defendant warned May that he would have to close down as the police had informed defendant that a report had come in concerning May's operation. Defendant's testimony that he advised Redden and May to close down because of the Kefauver investigation also corroborates the fact that defendant was aiding and abetting the operation. At his second trial defendant for the first time produced evidence of an alibi as to his whereabouts on November 28th, a date of considerable importance at the former trial as well as at this one. Defendant's testimony in a number of respects was contradictory of other statements made by him. Defendant's testimony at the trial and his conflicting statements tended strongly to corroborate the testimony of the accomplices.

■■ "The defendant's statements and admissions, made in connection with his testimony, may afford corroboratory proof sufficient to sustain a verdict. False or conflicting statements as to material facts may constitute corroborative evidence." (*People* v. *Dodd,* 113 Cal.App.2d 682, 686 [248 P.2d 965].) See *People* v. *Jordan,* 115 Cal.App.2d 452 [252 P.2d 328], for an excellent résumé of the rules relating to corroboration.

## ALLEGED ERROR

Defendant in his opening brief makes the broad blanket charge that the court erred on rulings on the admissibility of evidence in eight general matters. He gives no grounds for such charge, nor does he discuss the matter further than to state that the court erred in those matters. Typical of the kind of charge made is the statement that the court erred in admitting any evidence of the bookmaking activities of Redden and May. In his closing brief he states: ". . . the crux of appellant's contention is that there is no legally admissible evidence in the entire record to support appellant's conviction. In this connection we stressed the lack of corroboration of the testimony of the two chief witnesses for the prosecution, and covered this question extensively. We made these contentions after repeatedly reading the entire transcript and thoroughly reviewing the law on the subject. No individual or specific citations can be made as to those contentions, as a reading of the entire record is necessary in order to determine the validity of such contentions." Without specifying why, or citation of authority, defendant contends the extrajudicial statements of May, Redden and defendant are inadmissible. ■ Defendant has violated the rule set forth in *People* v. *Goodall,* 104 Cal.App.2d 242, 249 [231 P.2d 119] : "It is the duty of the defendants to show error, and that means defendants are under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent." It might be pointed out that defendant himself offered Redden's extrajudicial statements. These statements were admissible under the authority of *People* v. *Suter,* 43 Cal.App.2d 444 [111 P.2d 23]. ■ The evidence concerning the relationship of defendant's mother-in-law with Saucke (both of whom were witnesses for defendant) was admissible for the purpose of showing the interest and bias of Saucke. (See *People* v. *Gould,* 111 Cal.App.2d 1 [243 P.2d 809].) It was limited to that purpose by the court. ■ As to

defendant's connection with slot machines, defendant brought it out in his own testimony and made no objection when asked concerning it by the prosecution. It was through his work with slot machines that he met the police officers. There was no undue restriction of defendant's examination of Mrs. Kiester as to the date of the birthday party. Although objections to a couple of questions concerning it were sustained, the matter was thoroughly gone into.

We have read the entire transcript and are unable to find any warrant for such blanket contentions. We fail to find any prejudicial error.

#### ALLEGED MISCONDUCT OF COURT AND DISTRICT ATTORNEY

Defendant attacks almost everything said by the district attorney in his argument, although as to very few of his remarks did defendant object at the time. A great deal of the matter to which he objects was in answer to defendant's rather vitriolic attacks on the district attorney. We fail to find any prejudicial misconduct in these remarks. Defendant attacks the district attorney also, because, he says, that subsequent to defendant's conviction May and Redden were given short county jail sentences, and that two other persons whom the evidence indicates might have participated in May's bookmaking activities were never prosecuted. These are matters entirely outside the record, and of course have no place on this appeal. Moreover, considerable of the voluminous transcript is due to the constant iteration and reiteration by defendant of his claim that May and Redden were receiving unduly favorable treatment by both court and counsel in having their sentencing continued from time to time until after the jury should decide defendant's fate. Likewise the alleged preferential treatment of the other two persons in not being charged at all was referred to on several occasions. The jury undoubtedly considered these matters in weighing testimony. [17] Probably goaded by defendant's constant contention that in effect the district attorney was conspiring with May and Redden to make up a case against defendant, the district attorney stated that the members of the grand jury believed that the evidence showed that defendant had committed the crimes charged. Defendant objected and assigned the statement as misconduct. The court should have then admonished the jury. In its final instructions, the court did give a direct and positive instruction to the effect that the indictment was a mere accusation and that it was not

evidence nor were the jury "authorized in the slightest degree to presume or to infer the guilt of the defendant therefrom." However, under the circumstances of this case we do not see how the delay in admonishing the jury could have been prejudicial. There is no similarity in the situation here to that in *People* v. *Edgar,* 34 Cal.App. 459 [167 P. 891], where the district attorney referred to the beliefs of the members of the grand jury during the course of what the court in *People* v. *Dykes,* 107 Cal.App. 107 [290 P. 102], stated was "an address of an inflammatory character" and where "the testimony of the prosecutrix in that case was inherently improbable." (P. 117.)

Defendant's own version of the alleged loan and his alleged disinterested advice to May to get out of the business, are so fantastic that the jury could have had no doubt that he was connected with May's bookmaking operations.

Defendant contends that there was unfair criticism of defense counsel throughout the trial by the court and the district attorney. Our examination of the transcript discloses no instances in which anything was done by the court in the nature of a rebuke of counsel which was not merited by counsel's persistent refusal to accept the court's rulings as final. Nor can we find any action of the district attorney that was prejudicial. There was an occasional statement concerning defense counsel induced by the heat of the arguments between them, but nothing of serious import in view of the constant implication by defense counsel that the district attorney's motive in this prosecution were ulterior.

Without objection, in response to a question on cross-examination, defendant stated that he had refused to testify before the grand jury on the ground of self-incrimination. Defendant's counsel in his argument referred to the fact that defendant had voluntarily gone before the grand jury but refused to testify on his counsel's advice. Thereafter the district attorney commented on his failure to testify. No objection was made to such comment. Counsel has cited no authority holding that such conduct is improper. (See Cal. Const., art. I, § 13; Pen. Code, § 1323; *People* v. *Jones,* 112 Cal.App.2d 430, 433 [246 P.2d 683].) Likewise we find no prejudicial restriction of defendant's cross-examination. While occasionally the court attempted some limitation, the matters limited were gone into again and again.

## INSTRUCTIONS

Defendant makes the blanket charge that the court erred in the giving and refusing of instructions. Except for the refusal to instruct on accomplices as to the first count, and the giving of an "instruction on the Saucke-Kiester" testimony, and an instruction on corroboration of the charge under section 653f, Penal Code, defendant makes no reference to any particular instruction given or refused. We have already determined that the accomplice instruction as to the first count should have been given. We are not sure we understand what instruction defendant is referring to as the one in the Saucke-Kiester testimony. Defendant does not point out what he claims to be erroneous about it. Nor can we find anything erroneous in the instruction or instructions to which we assume he refers. As we have reversed the conviction of the crime charged in section 653f, Penal Code, it is unnecessary to discuss the instruction complained of. The instructions as to corroboration of the other charges were proper.

Defendant's opening brief is replete with general statements of denial of a fair trial, without specific or transcript reference, and without citation of authorities. █ ". . . in the absence of authorities or references to the transcript where such alleged misconduct may be found, the general charge of prejudicial misconduct should be disregarded." (*People* v. *Van De Wouwer,* 91 Cal.App.2d 633, 641 [205 P.2d 693].) Among others he claims that the public and jury were "inflamed by newspaper and radio accounts of the charges in this case." There is nothing in the evidence to support this statement. (See *People* v. *Stroble,* 36 Cal.2d 615, 620 [226 P.2d 330].)

The judgment of conviction on the first count and the order denying a new trial thereon are reversed and a new trial ordered thereon. As to the second and third counts, the judgment and order denying a new trial are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied April 28, 1953.