[Crim. No. 3791. Second Dist., Div. One. Aug. 24, 1944.]

THE PEOPLE, Respondent, v. JOHN BLACKBURN, Appellant.

Gladys Towles Root for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

YORK, P. J.—By an information containing two counts, defendant was charged (1) with the crime of grand theft, in that on July 4, 1943, he feloniously took motor vehicle tires and wheels of the value of $728; and (2) with the crime of receiving stolen property, together with a prior conviction of burglary. Defendant's motion to set aside the information under section 995 of the Penal Code having been denied, he entered a plea of not guilty to each count and denied the prior conviction. However, when the case was called for trial defendant admitted the prior conviction. The jury found defendant guilty of grand theft, as charged in count 1 of the information and not guilty of receiving stolen property. From the judgment of conviction which was thereafter entered, and from the order denying his motion for a new trial, defendant prosecutes this appeal.

The facts which form the background of the instant prosecution appear to be as follows: On July 4, 1943, Charles L. Adley owned and operated a motor truck company at 9854 South Alameda Street, Southgate, and maintained about nine pieces of equipment on three lots enclosed with a high wire fence with barbed wire on top. Entrance to the establishment was on Tweedy Boulevard through a double gate which was kept locked when no one was there. At noon on July 5th, Mr. Adley "missed the tires and wheels off of three different pieces of equipment," or trucks, to wit: eight tires and eight wheels, two from a Sterling Diesel tractor, two from a G.M.C. truck and four from a G.M.C. tractor. A jack

belonging to Mr. Adley was left under the Sterling Diesel tractor, from which the two tires and wheels had been removed, and blocks, jacks and other tools belonging to Mr. Adley and which were used to detach the tires and wheels, were left scattered around the lot. At the time the tires and wheels were discovered to be missing, the entrance gate to the establishment was still locked, but the metal fence, as testified by Mr. Adley: "had been cut about the middle of the east side . . . from the bottom up to about shoulder height and being on a spring tension, it had gapped open. . . . It was almost directly east of the third piece of equipment . . . which had four tires missing. . . . there were both tracks and foosteps and tracks where tires had been rolled." The cut opening in the fence was about three feet across at the bottom and went to a V at a height of about five feet. The wheels and tires taken from the lot were about 3½ feet tall. Upon discovering the theft, Mr. Adley called the Southgate Police Department and Officer Hamilton, Lieutenant Chase and Sergeant Heymans, together with Mr. Adley, made an investigation of the terrain surrounding the premises in question, and observed tire marks extending "through the hole in the fence, north on the outside of the fence" to the next street, a distance of about 80 feet. They then "picked up the tire tracks again at the end of the pavement at the other corner of the lot," where the tires "had been, rolled in a slightly northeasterly direction . . . across the Southern Pacific right-of-way and across Alameda Street to the west side of the pavement, and north parallel but back from the pavement" to the next street, which was a short block away from the hole in the fence. A short time after this search, Mr. Adley was taken by Lieutenant Chase to a small building used as a garage about a block from his place of business, where the missing equipment had been located by the officers, and there he identified it as his property.

The building where the stolen property was found at 9659 South Alameda Street was of corrugated iron construction used by George O. Cook in the conduct of his business of wholesale motor oil and deliveries. The building was 30 feet by 60 feet with two doors, one on the south side and one on the east side, and housed a Ford V8 tank truck and drums of oil. Mr. Cook testified he had known appellant about four months before July 4, 1943, that he worked around the neighborhood, and about the middle of June, 1943, appel-

lant "came to me and wanted to know if·he could store his furniture in my place or building. He wanted to rent the place back there. I told him he did not need to rent it, he could leave it there. He had to leave the house he was living in, had no place to leave it in. . . . there was a whole houseful of furniture"; that he saw appellant around there a number of times, possibly five or six times; that the witness left the garage early in the morning and was gone all day; that he would come in, put his truck away and go home, remaining at the place from one-half to three-quarters of an hour in the morning and the same in the evening; that in the early morning of July 6, 1943, the police came to his (Cook's) place of business and asked him to go with them to the police station at Firestone and Alameda, where he saw some tires and wheels; that he never saw them in his garage; and that in addition to appellant's furniture and the witness' own drums of oil, some old picture frames were stored in the building; that the witness "used to leave the lock fixed on the door so it really wasn't locked, but it appeared to be locked, so he (appellant) could get in and out if he wanted to. If for any reason the door was locked, all he had to do was pull the bottom of the door and he could get through; that so far as the witness knew, no one other than appellant lived on the premises. On cross-examination, Mr. Cook testified that a number of people around the neighborhood had access to the garage and "if they wanted something and I have a lot of tools in there. If they wanted jacks, anything like that, anything they needed they didn't have available of their own, they could go to my place and borrow mine. That was all right." On redirect, Mr. Cook stated that as to other people, he didn't give them permission to go in, but he did not stop them, "I never said don't go in"; and that appellant was the only one in July of 1943 whom he permitted to have access to his building.

Mr. Merritt, a welding contractor, with a place of business at 9651 South Alameda, located next door to the Cook Oil Company, testified that he saw appellant polishing a car at three o'clock in the afternoon of July 5, 1943, in front of the corrugated iron building (where appellant's furniture was stored); that when he saw him, appellant was about forty feet away; that about ten minutes later, the witness saw Officers Hamilton, Heymans and Chase approach said build-

ing and Officer Hamilton came up to the fence to talk to the witness, at which time the latter noticed that appellant had left.

Officer Chase testified that on July 5, 1943, he received a call from Mr. Adley and went to the latter's place of business about three o'clock in the afternoon where he found Sergeant Heymans and Officer Hamilton; that he observed the hole in the fence and saw tire tracks on the Adley lot, but went no further; that he was present at the conversation with Mr. Merritt and that shortly thereafter he saw appellant in the corrugated iron building operated by Mr. Cook; that Sergeant Heymans opened the door by shaking it and loosening a board which had been propped up against it on the inside; that appellant was "just outside of the north wall of the lean-to shed attached to the rear of this Cook Oil Co. The wall is about half board. The upper half is made of chicken wire." The witness stated he was 6 or 8 feet from appellant to whom he said, "I was wondering if anybody was here. Do you belong here? or 'Do you work here?' . . . he said 'Yes'. I said, 'Are you coming up front? I want to talk to you.' He said, 'Yes.' So I started to walk up toward the front end and then I realized I had seen the defendant before. I went looking for him and he was gone." Said witness then stated that he searched the corrugated iron building and saw the tires (describing them) which Mr. Adley later identified as those stolen from his place of business. That on July 6, 1943, about 7:30 o'clock in the evening, he saw appellant in front of the Cook Oil Company in the custody of the two officers said witness had staked out in the building; that after they went to the police department, the witness asked appellant if he remembered their conversation of the day before, and appellant replied that he did not see the officer, that he was not there; that the witness then asked appellant "What were you doing in that place? He said, 'I wasn't in that place. I ain't going to incriminate myself and I ain't going to tell you nothing.' Then I talked to him a few minutes later alone in my office and . . . I said, 'If you are not going to tell me the truth, just give me a lot of denials, there is no use of us wasting one another's time.' He said, 'That is it.' And I talked to him a few minutes later in Sergeant Heymans' office. The defendant stated he had

witnesses of the time, and he says, 'You get your witnesses and I will get mine, and we will present it to a jury.' ''

Officer Heymans testified that he went to Mr. Adley's trucking yard on July 5, 1943, and examined the ground and followed tracks which led ''from the trucks through the hole in the fence north along the east side of the fence to Nebraska Avenue. Then they disappeared on the sidewalk and the pavement. Then I went approximately one-half back to the right of way of the Southern Pacific tracks . . . (Where) the same tracks took up again there. . . . we picked them up again on the west side of the (Southern Pacific) tracks across Alameda Street and followed the tracks on the soft ground to a point approximately 90 feet south to 9659 South Alameda Street (where the tires were found).'' That said witness and Officer Healy staked out at Cook Oil Company's corrugated iron building at 9659 South Alameda at six o'clock p. m. of July 6, 1943; that appellant ''peeked into the side door'' at 7:45 o'clock in the evening; that all the witness saw was appellant's head before the latter turned and ran, whereupon said witness pursued appellant into the lean-to at the rear of the building where Officer Healy told him ''Either stop or I will shoot,'' and they placed appellant under arrest. On cross-examination, this witness (Officer Heymans) testified that he observed foot prints alongside of the tire tracks from Adley's to Cook's but he made no comparison between those prints and appellant's shoes, and that about five minutes before appellant looked in the door at Cook's on July 6, 1943, at 7:45 p. m., appellant's wife and children came in and were present when appellant was arrested.

Appellant took the stand in his own defense and denied that he stole any tires from Mr. Adley on the 4th, 5th or 6th of July, 1943. He testified that on July 5, 1943, at 4:00 p. m., he was on 48th Street between Hooper and Ascot taking down and connecting up a gas stove; that he went to Cook's Oil Company at 9659 South Alameda at noon on July 5th to get a wrench for use in connecting up the stove; that all of his tools were there; that he left Cook's at 1:30 that afternoon and on the next evening he returned there at about 7 o'clock, at which time ''this officer came running out of the building with a shotgun on me and and I never had a chance to even turn around; in fact I was afraid to turn

around." Appellant denied that he ran or put his head in the door and stated that the officer "finally handcuffed me after about 10 or 15 minutes." Upon cross-examination, appellant testified that he had all of his household goods stored in the Cook garage, as well as his tools, and that he slept there a few times before July 4th; that he was a dipper at Cal Ship and that he worked at the plumbing trade where he learned to install bathtubs; that he weighed 158 pounds and was 5 feet 5 inches in height and was forty-three years of age and considered himself quite stocky and broad; that he knew how to change tires but "never changed a truck tire in my life"; that on July 4, 1943, he went directly from his work to the Cook place and slept there awhile that morning, leaving at about 2:00 p. m., that the Cook oil truck was in the building when he left; that he was at the Cook place on July 5th from around noon to 1:30 p. m., but did not see Officer Chase and had no conversation with him; that he saw Mr. Merritt but did not see him talking to the police officers.

Appellant here urges insufficiency of the evidence as a ground for reversal of the judgment of conviction, pointing out that none of the stolen merchandise was found in his exclusive possession "it appearing from the evidence that several persons had access to the shed where the merchandise was found"; and that one of the elements of the crime charged is missing, viz.: the element of taking or asportation, upon which no evidence was presented.

In support of this contention, appellant cites the case of *People* v. *Hurley*, 60 Cal. 74 [44 Am.Rep. 55], in which it appears that certain cattle alleged to have been stolen were first missed on October 24, 1879, and their hides were found in defendant's barn on November 27, 1879. The barn in which the hides were found, "was never locked, and the neighbors went into it whenever they chose, which, one of the witnesses stated, was almost daily. The hides, when discovered, were hanging upon a pole visible to all who might enter the barn. The defendant and several members of his family, together with one or more witnesses, testify that they entered the barn repeatedly during the period intervening the loss of the cattle alleged to have been stolen and the discovery of the hides, and that during that intervening period they saw no hides there, although they thought they should have seen them if there. There is no conflict in the evidence upon any

material point. As we view it, there is none, except the bare fact of the discovery of the hides of the missing cattle in the defendant's barn, which militates in any degree against him.'' The judgment of conviction was reversed in the cited case, the court holding (p. 76) : ''The assertion that the recent possession of stolen goods in a case of larceny raises a presumption that they were stolen by the possessor, is not strictly accurate. The cases in which that has been said are those in which it also appeared that the possessor acquired the possession by his own act, or with his concurrence or knowledge. If it had been shown in this case that the defendant placed these hides in his barn, or caused them to be placed there, or knew that they were there, or exercised any acts of possession over them, the case would be essentially different from what it now is. His explanation 'that he knew nothing about the hides being in his barn' was the only one which he could give unless he did know something about their being there; and the only way to prove his explanation false was to prove that he did know something about it. . . . If true, his explanation was as satisfactory as any ever given of the possession of stolen property; and it was incumbent on the prosecution to prove it untrue before asking a conviction.

''In Cowen & Hill's notes to Phillips on Evidence, 530, it is said, 'that although a finding even in the prisoner's house is admissible, yet where there is not a more direct possession shown, and there are other inmates in the house capable of stealing the goods, this finding *per se* would not raise the presumption. Other circumstances should be shown. . . .' And in a note following that from which the above quotation is taken, it is said: 'The better opinion seems to be that the presumption arising from possession alone is completely removed by the *good character alone* of the prisoner.' The good character of the defendant in this case was testified to by witnesses who stated that they had known him fourteen years, and no attempt was made to rebut their testimony. . . .

''Burrill states the law as follows: 'The possession must be exclusive. The finding of stolen property in the prisoner's house or apartment, is equally competent in evidence against him, as a finding upon his person. But the house or room must be proved to be in his exclusive occupation. If the property were in a locked-up room or box, of which he kept

the key, it would be a fair ground for calling upon him for his defense. But if it were only found lying in a house or room in which he lived jointly with others equally capable of having committed the theft, it is clear that no definite presumption of guilt could be made.' We do not think that the bare fact of finding the hides of cattle that had been stolen in the defendant's barn, which is shown to have been open to any one who chose to enter it, in the absence of any evidence tending to prove that he knew or had any reason to suppose that such hides were there, sufficient to justify the inference which the jury must have drawn from it, in order to find the defendant guilty.''

In the late case of *People* v. *Enriquez,* 39 Cal.App.2d 168, 172 [102 P.2d 770], wherein appellant complained of the refusal of the trial court to give the following instruction to the jury: ''The possession of stolen property is not of itself sufficient evidence of the guilt of the party in whose possession it is found and if you find no evidence of the guilt of the defendant other than the possession of the stolen property, it is your duty to render a verdict of not guilty.'' —it was held: ''This instruction correctly sets forth a principle of law which has been approved in many decisions and the court committed prejudicial error in refusing to give it to the jury. (4 Cal.Jur. 741 and cases there cited.) It was the duty of the court to instruct the jury as to the principles of law pertaining to the facts and circumstances presented in the evidence. (*People* v. *Chesney,* 72 Cal.App. 570 [237 P. 793].) Although the court may in a proper case decide whether there is any competent evidence in addition to proof of possession of stolen property, the question ordinarily is for the determination of the jury whose province it is to weigh the evidence and draw reasonable inferences therefrom. . . . No presumption of guilt arises from possession of stolen property or the failure of defendant to account for his possession of it, but the question of defendant's guilt must be left to the determination of the jury from all the facts and circumstances shown in evidence.''

Applying the foregoing principles of law, it would appear that, in addition to proof that the stolen property was found in the building frequented by appellant, other facts and circumstances must of necessity be established connecting appellant with the crime from which the jury could have drawn an inference of his guilt.

The case is one of circumstantial evidence, no identification having been made of appellant as the person who cut the fence and removed the tires and wheels from the Adley lot to the Cook garage. Nevertheless, the evidence does show that appellant was more than wary of the police officers, in that on July 5th, when Mr. Merritt was conversing with Officer Hamilton, appellant left the Cook place where he had been polishing a car; that when Officer Chase shortly thereafter encountered appellant in the Cook garage and told him he wanted to talk to him, appellant disappeared. Again, on July 6th, when appellant stuck his head in the door of the garage and saw the officers staked out there awaiting him, appellant turned and fled. Of course, all of this was denied by appellant.

These various acts of appellant indicating flight on his part; his alleged statements to the officers that he would let a jury decide his case; his refusal to make any explanation to the officers on the ground that he might incriminate himself; his admission of a prior conviction of a felony, together with his want of frankness with the officers and his failure to deny unequivocally that he knew anything about the tires or their presence in the garage,—were entirely inconsistent with innocence and constitute a sufficient basis for the jury's finding of appellant's guilt. (Code Civ. Proc., §§ 1958 and 1960.) In other words, the evidence is sufficient to sustain the judgment of conviction and therefore the court did not err in denying appellant's motion to strike pursuant to section 995 of the Penal Code.

For the reasons stated, the judgment and order appealed from are, and each of them is, affirmed.

Doran, J., and White, J., concurred.