[Crim. No. 4041.   First Dist., Div. One.   Mar. 6, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE JAMES FORD et al., Defendants and Appellants.

Harold D. Winingar, Jr., for Defendants and Appellants.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Richard Diebold Lee, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendants Clarence James Ford and Ralph Harold Manchester were convicted by a jury upon two counts of petty theft with prior felony convictions. (Pen. Code, § 667.) They appeal from the judgment and from the order denying their motion for a new trial.

The case before us involves separate thefts of two bicycles at Dixon and Vacaville on the night of January 13, 1961.

A red bicycle belonging to one Carpenter was stolen from the front of his house in Dixon, California. Carpenter last saw it there at about 7 or 8 p. m. He then left for a nearby café. While he was sitting in the café from which place he could see his house, Carpenter noticed a car stop for a minute or two in front of the house. When he returned home at about 11 p. m., the bicycle was gone.

On the same evening, a green bicycle belonging to one Cooprider was stolen from the latter's home in Vacaville, California. Cooprider last saw his bicycle in his driveway

about 11 p. m. when he left his house. When he returned about 12 it was gone.

Later the same evening, at about 11:30 p. m., Chief of Police Fellers and Officer DeGarcia of the Vacaville police department, in their patrol car, came upon both defendants and one Jack Leighton in and near a parked car on East Main Street in Vacaville, about a block from Cooprider's house. Manchester was sitting behind the steeringwheel, Leighton was in the right front seat bending over into the back, and Ford was outside the vehicle on the right side looking down at the rear tire. The police made a U-turn, came up behind the defendants' vehicle, and stopped. As they did so, Manchester and Leighton got out of their car, went to the rear and opened up the trunk. Ford went to the rear with them.

DeGarcia asked them what they were doing. One of the men, whom DeGarcia later identified as Manchester, said they were having trouble with the right rear wheel of their car. While this was going on Chief Fellers noticed two bicycles in the back seat, a red one with a blanket over it, and a green one on the floor but protruding through the right rear door which was open. Observing that the green bicycle had a Vacaville license plate Fellers returned to the patrol car, contacted the police station and was advised that the bicycle belonged to a resident of Vacaville. The police then took all three men and the two bicycles to the police station in a patrol car.

Just before this occurred, DeGarcia asked where the men had obtained the bicycles and was told by Manchester that two boys had come over and asked them to carry the bicycles downtown for them. Manchester then said "He ran there . . . those cars over there . . . you see them?" But DeGarcia saw no one.

DeGarcia testified that when they arrived at the police station he put Ford and Manchester in separate rooms and talked to Ford first. Ford told him that he worked for Manchester, cleaning furnaces, and that they were on their way from Reno to San Francisco. DeGarcia further testified that Ford told him that he knew the bicycles were stolen; that he would rather not say who put the bicycles in the car; and that the others would more than likely say that he, Ford, put them in because of past experiences. Ford also stated that the three men had stopped on the above street in Vacaville because they had trouble closing the door on the bicycle and

that he, Ford, had been outside the car trying to close the door. According to DeGarcia, Ford said that there was no one else there but the three of them. Later that evening, after he had interrogated Manchester, DeGarcia returned to the room where Ford was. Ford told him, DeGarcia testified, that the three men were low on gasoline and were going to sell the bicycles for expense money.

DeGarcia also testified as to his separate interrogation of Manchester on the same night. Apparently DeGarcia to some extent went back and forth between the two men in order to check their stories. According to DeGarcia, Manchester's conversation with him was as follows: Manchester started out by asking DeGarcia if he had found the boy who had run off. DeGarcia said he had not. Manchester expressed concern for Leighton because the latter was a young boy and this was his first offense. He stated that Leighton had not been out of the car at any time; had been asleep in the back seat when the others put the bicycles in; and had to be awakened and put in front. DeGarcia then took Manchester to see Leighton who was also in custody. Manchester thereupon told Leighton to give the police what they wanted but DeGarcia noticed that Manchester was winking at Leighton. DeGarcia returned Manchester to the latter's room. Later, when DeGarcia asked him who put the bicycles in the car, Manchester replied that he didn't want to put the blame on anybody but he figured it was one of the others. According to DeGarcia, neither Manchester nor Ford said that they took the bicycles. DeGarcia had no other conversations with either defendant.

DeGarcia's testimony pertaining to the statements made by both men, was admitted in evidence under careful instructions by the court to the jury that the statements of each defendant, having been made out of the presence of the other, could be considered as evidence only against the defendant making the statement.

The above evidence was introduced during the case in chief for the prosecution, which consisted of the testimony of the two owners of the bicycles and the two police officers. Thereupon the defendants moved for a dismissal upon the ground that no theft had been established against the defendants. The motion was denied.

Both defendants testified on their own behalf. Manchester testified that they were coming from Reno and had left Sacramento at about 11 or 11:15 p. m. Half way between Dixon

and Vacaville he stopped and picked up a rider. He had not stopped at, or even gone through Dixon. The hitchhiker said that his brother and sister had been riding their bicycles and had left them in Vacaville; he offered Manchester five dollars to return the bikes to their home. Manchester accepted the offer, drove to Vacaville, and at the direction of the stranger made a turn in a blind alley, while the hitchhiker got one bicycle and put it in the car. The hitchhiker then directed Manchester to Main Street and had Manchester pull over so that he could get the second bicycle. According to Manchester, the stranger was actually riding the bicycle back to the car, when the police first drove by. After the police stopped, Manchester and Leighton got out of their car, but the stranger disappeared.

Ford told substantially the same story. He did not recall making any of the statements to DeGarcia, as the latter had testified, except that "the only statement I recall making was that evidently the bicycles were stolen or the guy wouldn't have ran . . . I stated that—that I would probably get the blame for it, because I had a prison record." On cross-examination, Ford admitted that Manchester, when first stopped by the police, had told them that the three men were taking the bicycles downtown for a couple of boys. Ford also admitted that there were no boys around at all.

In rebuttal, the prosecution introduced testimony of both police officers to the effect that they saw no man riding a bicycle as claimed by the defendants. DeGarcia testified that he saw no fourth man at all.

The third man, Leighton, did not testify at the trial. He had previously been convicted in the Justice Court at Dixon of the theft of the red bicycle, and subsequently, upon his plea of guilty, was convicted, in the Justice Court at Vacaville, of the theft of the green bicycle. He was sentenced to serve 30 days in the Solano County jail, was released, and disappeared. The defense were unable to subpoena him. The prosecution did subpoena him but he failed to appear.

The defendants contend here that (1) they were denied their constitutional right to appear and defend by counsel, in that their representation by court appointed counsel was inadequate; (2) defendant Manchester was deprived of his right to defend himself; (3) the evidence is insufficient to sustain their conviction; and (4) the trial court erred in giving certain instructions to the jury. We have concluded

that none of the above contentions have merit and that the judgment and the order denying the motion for a new trial should be affirmed.

*Adequate representation by counsel.*

Counsel below, who is not counsel on appeal, was appointed for both defendants on their arraignment. One week later, his withdrawal as counsel for Manchester was approved by the court, since Manchester desired to secure his own counsel. Subsequently, for reasons not disclosed in the record, this arrangement was changed, and the original counsel appeared for both defendants at the time of their plea, and thereafter throughout the proceedings and trial.

Defendants' claim of inadequate representation appears to be based on three complaints against their counsel: (1) although he was aware of the fact that Leighton, the third man involved in the thefts and a material witness, might leave the jurisdiction, counsel failed to secure Leighton's presence at trial or perpetuate his testimony; (2) he relied upon the prosecution to issue a subpoena for Leighton; and (3) he failed to point out to the jury that the defendants had been deprived of the benefit of Leighton's testimony. It is further argued that defendant Manchester attempted to have trial counsel bring to the court's attention that Manchester had been deprived of Leighton's testimony and further that he had sought the dismissal of counsel, so that he could point this out to the jury himself.

The contention of inadequate representation has no merit. Our examination of the record discloses that defendants' counsel took an active part in the entire trial, made objections to testimony, cross-examined competently, made motions to dismiss, conducted in an able manner the direct examination of the defendants, and all in all presented a competent defense to the charges. While Manchester was on the stand, the trial judge stated that he felt counsel "had done an excellent job."

All of the complaints in connection with the failure to produce Leighton, are centered around the bare assertion by defendants that since Leighton actually confessed to one of the thefts and was convicted of the other, his testimony would prove defendants' innocence. We find nothing in the record to support such an assertion. From the fact that Leighton was convicted, it does not necessarily follow, in the light of the evidence before us, that the two defendants here were innocent. As we view the record it is very probable

that Leighton's testimony would have been disastrous for defendants. Indeed, defendants in their brief admit, in effect, that they are only assuming that Leighton's testimony would be favorable to them. Not a single reference to the record is made to support the assumption. It appears to us that Leighton's disappearance may well have been a felicitous circumstance for defendants.

Nor does the record disclose how counsel could have produced Leighton anyway. It shows that the prosecution subpoenaed Leighton but he failed to appear. Defendants do not explain to us why counsel's efforts would have been less futile. It is not clear from the record when Leighton was in jail, when he was released, when he disappeared and whether counsel was advised of these facts before the first day of trial.

Contrary to defendants' argument that he did not, their counsel brought the matter of Leighton's absence to the attention of the court on the first day of the trial. Colloquy between the court and counsel for both parties developed that the prosecution had subpoenaed Leighton but he had not appeared. At the end of the case for the defense, counsel again reminded the court that Leighton was under subpoena and announced that the defense would call Leighton as a witness, if he were available. Leighton still had not appeared. As we have stated above, the record does not show that defendants' counsel had any notice of the facts pertaining to Leighton before the first day of trial. As we view them, therefore, the above incidents merely show that defendants' counsel called the facts to the attention of the court and later on, since it was apparent that Leighton had disappeared, made an effort to see whether he had responded to the prosecution's subpoena. They do not show, nor does any other part of the record show that counsel had relied "upon the prosecution to issue subpoenas to insure the presence" of Leighton.

Defendants argue that their counsel failed to point out Leighton's absence to the jury but do not enlighten us as to why this fact could or should have been considered by the jury. Nor is it true, as argued, that Manchester sought dismissal of trial counsel, so that he could do this. On the contrary, the record shows that Manchester sought such dismissal because of some misunderstanding concerning the extent of permissible cross-examination dealing with his prior felony convictions.

Inadequacy of representation by counsel will not in every case be declared to violate the constitutional right of

the accused to appear and defend by counsel and thus contravene due process. ■ "The handling of the defense by counsel of the accused's own choice will not be declared inadequate except in those rare cases where his counsel displays such a lack of diligence and competence as to reduce the trial to a 'farce or a sham.' [Citations.]" (*People* v. *Wein*, 50 Cal.2d 383, 410 [326 P.2d 457]; see also *People* v. *Redden*, 187 Cal.App.2d 275, 279 [9 Cal.Rptr. 368].) We feel that the above test of the inadequacy of counsel applies to counsel appointed for the accused as well as to counsel of the accused's own choice. ■ When the accused claims that his constitutional right has thus been violated, the burden of sustaining such charge is upon him. (*People* v. *Robillard*, 55 Cal.2d 88, 97 [10 Cal.Rptr. 167, 358 P.2d 295].) The defendants have failed to make any such showing. They have contented themselves with bare assertions of inadequacy. The record, on the other hand, shows that they received competent representation throughout the entire trial. It fails to show any inadequacy within the test laid down in the *Wein* case. Even if we assumed that defense counsel should have subpoenaed Leighton while the latter was still available, such failure in our opinion represents only a mistake of judgment which did not "destroy the integrity of the proceedings as a trial" and therefore would not constitute a denial of due process. (*People* v. *Scott*, 186 Cal.App.2d 661, 666 [9 Cal.Rptr. 75].) Despite all the assumptions, the fact remains that Leighton did not respond to the prosecution's subpoena.

*Manchester's right to defend himself.*

■ We have already adverted to the original appointment, temporary withdrawal and reappointment of counsel for the defendant Manchester.

Manchester was the first witness for the defense on the morning of the second day of the two-day trial. At the beginning of his cross-examination, he was questioned by the prosecutor as to his prior felony convictions. Although, in answer to the first question, he admitted that he had been previously convicted of a felony, he refused to respond to the following related questions and asked permission to consult with counsel. His counsel had not objected to the questions. After such consultation, Manchester stated: "I decline to answer them on the grounds they become incriminating and I ask at this time for the dismissal of counsel." The court indicated that it would insist on answers by Manchester. Manchester claimed that he had been advised by his counsel

that cross-examination could not extend beyond the question which he had answered, that he would not otherwise have taken the stand, and that he had been misled. Counsel acknowledged his duty, as court-appointed attorney, to remain as counsel for Manchester during the entire trial but offered to withdraw, if the court felt it was the best thing to do. The court denied Manchester's request after stating to Manchester's counsel "I think you should proceed with this matter. I feel that Mr. Manchester is in need of an attorney, and I feel that you have represented him very well so far." The district attorney proceeded to question Manchester as to the number and identity of his felonies and when and where they were committed. Manchester thereupon answered these questions.

We first dispose of certain preliminary matters. In their brief, defendants assert that Manchester thought he would be conducting his own defense at the time of the trial. It is inconceivable that Manchester was laboring under that misunderstanding, for his counsel had conducted all the cross-examination of witnesses for the prosecution and the direct examination of Manchester, before Manchester made his request to dismiss counsel. Next defendants claim a strained relationship between Manchester and his counsel which condition failed to insure proper representation. Defendants do not refer us to any portions of the record to support such statement. Indeed, we find no evidence of such claim in the record. Defendants, under this contention, again urge counsel's failure to secure Leighton's presence. We have already shown this charge to be without foundation. Defendants, in furtherance of their argument based on the "absence of compatibility" between Manchester and counsel, allude to the fact that Manchester "attempted repeatedly to remove counsel." Defendants fail to make a single reference to the record for support. The fact is that Manchester made only one attempt to remove his counsel, as we have recounted above. It is also clear, as we have pointed out already, that this attempt arose out of impeachment questions asked of Manchester by the prosecutor. Finally, it is urged that if Manchester had been permitted to represent himself, he could have cross-examined his codefendant Ford and brought out "the facts surrounding the witness Leighton." What rewarding results this would have produced are not indicated to us.

Having cleared away the above debris, we examine the

question of alleged denial of the right of self-representation.
An application on the part of an accused, made after the commencement and during the course of a criminal trial, to discharge his counsel and to continue his defense in propria persona without the assistance of counsel is addressed to the sound discretion of the trial court. (*People* v. *Wilson*, 46 Cal. App.2d 218, 223 [115 P.2d 598]; *People* v. *Warner*, 134 Cal.App.2d 829, 831 [286 P.2d 560]; *People* v. *Mitman*, 184 Cal.App.2d 685, 690 [7 Cal.Rptr. 712].) We find no abuse of discretion in the denial of Manchester's request in the case before us. He was represented by able and conscientious counsel. As the trial judge observed, he was in need of an attorney and had been well represented up to that point in the trial.

*Sufficiency of the evidence.*

On this subject, defendants make two contentions. First, they urge that the trial court erred in denying their motion to dismiss at the conclusion of the prosecution's case in chief. Secondly, they urge that the verdict was ''contrary to the evidence in the case'' and that ''no evidence . . . showed the defendants were in any way connected with the theft.''

Although the reporter's transcript consists of 225 pages of which 154 deal with the trial exclusive of the arguments to the jury, counsel for the defendants in his opening brief (no closing brief was filed) asserts the first point above in *two sentences* consisting of *eight* lines, and the second point in *three* sentences consisting of *seven* lines. There is only one reference to the reporter's transcript. A bare citation of three cases is interpolated between the two contentions. There is no analysis of the evidence. There is no development of argument which, by reference to the material evidence on the point raised, shows how and in what particulars the evidence is insufficient. It is a cardinal rule that one who asserts that the verdict is not supported by the evidence, must set forth the evidence involved and point out wherein it fails to support the verdict. (*People* v. *Finley*, 174 Cal.App.2d 206, 208 [344 P.2d 614].) As it is stated in *People* v. *Goodall*, 104 Cal.App.2d 242, 249 [231 P.2d 119]: ''It is the duty of the defendants to show error, and that means defendants are under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent. (*People* v. *Shafer*, 101 Cal.App.2d 54, 60 [224 P.2d 778]; *People* v. *Daniels*, 85 Cal.App.2d 182, 185 [192 P.2d 788].)''

We do not think that defendants' counsel has properly presented the contention on the sufficiency of the evidence. If his contention has merit, it should be presented fully; if it does not, it should not be presented at all.

Nevertheless, we have carefully examined the record and we find more than sufficient substantial evidence to support the verdict of the jury. We have also concluded that the defendants' motion to dismiss made at the close of the prosecution's case was properly denied.

We quote from *People* v. *Phelps,* 192 Cal.App.2d 12, 15 [13 Cal.Rptr. 383] which summarizes the applicable legal principles: ''Although mere possession of stolen property will not sustain the possessor's conviction of its theft, such possession plus 'slight corroborative evidence of other inculpatory circumstances' (*People* v. *Holland,* 82 Cal.App.2d 310, 312 [186 P.2d 58]; *People* v. *Wissenfeld,* 36 Cal.2d 758, 763 [227 P.2d 833]; *People* v. *Citrino,* 46 Cal.2d 284 [294 P.2d 32]; *People* v. *Thompson,* 120 Cal.App.2d 359 [260 P.2d 1019]), such as acts, conduct or declarations of the accused tending to show his guilt (*People* v. *Citrino,* 46 Cal.2d 284 [294 P.2d 32]; *People* v. *Boxer,* 137 Cal. 562 [70 P. 671]), false and misleading accounts of possession (*People* v. *Conrad,* 125 Cal. App.2d 184 [270 P.2d 31]; *People* v. *Goodall,* 104 Cal.App.2d 242 [231 P.2d 119]; *People* v. *Machabie,* 33 Cal.2d 67 [198 P.2d 681]; *People* v. *Buratti,* 96 Cal.App.2d 417 [215 P.2d 500]), failure to show honest possession (*People* v. *Lang,* 142 Cal. 482 [76 P. 232]; *People* v. *Taylor,* 4 Cal.App.2d 214 [40 P.2d 870]; *People* v. *Blackburn,* 65 Cal.App.2d 538 [151 P.2d 24]), and an attempted disposition of the property for less than its value (*People* v. *Clark,* 122 Cal.App.2d 342 [265 P.2d 43]; *People* v. *Buratti,* 96 Cal.App.2d 417 [215 P.2d 500]), will suffice.''

The evidence shows that the red bicycle was stolen at Dixon sometime before 11 p. m. on the night in question. The green bicycle was stolen at Vacaville on the same night, sometime between 11 p. m. and 12 p. m. Defendants were found in possession of the two bicycles. At that time, the police came upon defendants in Manchester's car only a block away from Cooprider's house where the green bicycle had been stolen. When the police asked the defendants for an explanation, the defendant Manchester claimed that some boys had delivered the bicycles to the defendants and asked them to carry the bicycles downtown for them. But down-

town Vacaville was only a block and a half distant. Manchester claimed that he saw the boys running off, although the police officer did not see them. When Manchester was interrogated at the police station, he stated in reply to a question of the police officer, that he did not want to say who put the bicycles into the car but figured it must have been one of the other two men. Manchester thus contradicted his first explanation about the boys. Moreover, Manchester's conduct in surreptitiously winking at Leighton, when he pretended to have the latter tell the police what they wanted, was suspicious and cast doubt on the explanations he had been giving the police. The jury could very well have regarded all of Manchester's story as a false and misleading account of possession.

As to Manchester there was possession, close to the scene of the last theft, together with evidence of misleading, contradictory and improbable statements explaining possession, and a failure to show honest possession. Such warranted a denial of his motion to dismiss.

Such reasons also sustain the verdict against him. On this question, they are fortified by Manchester's testimony during the case on defense. In this testimony, Manchester offered the explanation concerning the hitchhiker, which itself was contradictory to the other explanations he had previously given the police.

The evidence against the defendant Ford not only showed, as it did against Manchester, possession close to the scene of the last theft. Ford admitted that he knew the bicycles were stolen, that he would rather not say who put them in the car, and that they intended to sell them to get gasoline money. Ford also admitted that the three men in his group were the only ones present at the place where the police arrested them. The defendant Ford also failed to show honest possession. Wrongdoing on his part is reasonably inferable. He admitted he had no lawful possession. His assertion that he did not take the bicycles could be disbelieved. In view of such evidence, it was not error to deny his motion to dismiss.

When we consider Ford's own testimony on the witness stand, additional support for the verdict is found. Ford denied making the statements attributed to him by the police, and repeated Manchester's explanation about the hitchhiker. This testimony was in flat contradiction to his statement to the police. On cross-examination, he piled contradiction on contradiction by admitting that at the scene of the arrest

Manchester had said they were taking the bicycles downtown for some boys.

Defendants rely upon *People* v. *Fagan,* 98 Cal. 230 [33 P. 60]; *People* v. *Disperati,* 15 Cal.App. 120 [113 P. 889] and *People* v. *Edwards,* 159 Cal.App.2d 208 [323 P.2d 484]. All three cases are, however, distinguishable from the case before us. In *People* v. *Fagan, supra,* the defendant was convicted of grand larceny of cattle. The prosecutor admitted that the defendant was not present when the cattle were taken. The uncontroverted evidence was that another person had taken the cattle and the defendant was fifty miles away when the larceny occurred. No direct evidence connected the defendant with the property until he was found with it 17 days later. The court felt that defendant had been convicted on the theory that he advised or encouraged the larceny, which was in no way sustained by the evidence. The conviction was reversed. In *People* v. *Disperati, supra,* the evidence showed that the defendant neither took nor assisted in the taking of the property but received it after the larceny and resold it. In fact, the theory in the trial court was that the defendant had committed the larceny on reselling the property, which theory was held untenable. In *People* v. *Edwards, supra,* upon a charge of theft of a trailer, the prosecution introduced evidence of a prior burglary to show a common plan, scheme or design and in such connection showed defendant's possession of a stolen safe without anything more. The introduction of this evidence was held to be error but not prejudicial in the light of the record.

*Error in instructions.*

Defendants object to the giving of the following instruction to the jury: "Evidence has been received in this case tending to show that on occasions other than this trial, the defendants themselves made statements tending to prove their guilt of the alleged crimes for which they are on trial. A statement thus made by a defendant may be either a confession or an admission." They contend: (1) the giving of this instruction was prejudicial error since it amounted to a characterization by the trial judge that somewhere in the evidence an admission or confession had been received; and (2) the instruction was particularly damaging to Manchester, since from the use of the plural, "defendants," the jury were in effect told they might consider admissions of Ford in deciding the guilt of Manchester.

The gist of defendants' argument on the first point is that there was only one statement made by either of the defendants which even approached an admission and that one was made by Ford. Hence, they argue, the instruction led the jury to believe that each defendant made an admission or confession. Defendants do not argue, therefore, that the court misled the jury by characterizing statements as confessions which might be only admissions. They claim that the court misled the jury by characterizing the statements as confessions or admissions, when in fact they were neither.

An admission is an acknowledgment of some fact which tends to prove guilt. It may be either express or implied. It thus differs from, and is more limited, than a confession which is a voluntary declaration by the accused that he is guilty of the crime charged. (Witkin, Cal. Evidence, § 242, p. 275; *People* v. *Ferdinand,* 194 Cal. 555, 568 [229 P. 341]; *People* ·v. *Chan Chaun,* 41 Cal.App.2d 586, 593 [107 P.2d 455].) As stated in *People* v. *Ferdinand, supra,* "[a]n admission as applied to criminal law is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt. On the other hand, a confession by a defendant leaves nothing to be determined, in that it is a declaration of his intentional participation in a criminal act, and must be a statement of such a nature that no other inference than the guilt of the defendant may be drawn therefrom." (Pp. 568-569 of 194 Cal.) Statements giving false explanations of the possession of stolen goods have been held admissible as implied admissions tending to show guilt. (*People* v. *Cox,* 29 Cal.App. 419, 422 [155 P. 1010]; *People* v. *Martin,* 16 Cal.App.2d 515 [60 P.2d 1014]; *People* v. *Hanz,* 190 Cal.App.2d 793, 802 [12 Cal.Rptr. 282].) However, no inference of consciousness of guilt can be drawn from the mere fact that the jury, in order to convict, must have disbelieved the explanations of the accused. "[O]nly where the false statement or testimony is intentional rather than merely mistaken and where such statement or testimony suggests that defendant has no true exculpatory explanation can it be considered as an admission of guilt." (*People* v. *Wayne,* 41 Cal.2d 814, 823 [264 P.2d 547].) "Consciousness of guilt is proved . . . by fabrications which, like devious alibis, are apparently motivated by fear of detection, or *which, like devious explanations of the possession of*

*stolen goods,* suggest that there is no honest explanation for incriminating circumstances and thus are admissions of guilt.'' (*People* v. *Albertson,* 23 Cal.2d 550, 582 [145 P.2d 7] ; emphasis added.)

As we have pointed out, the record shows the following statements made by Ford to Officer DeGarcia: (1) that he knew the bicycles were stolen; (2) that no one else except Ford, Manchester and Leighton were present; (3) that he would rather not say who put the bicycles in the car; (4) that when the police first drove up, the three men were having trouble closing the rear door and Ford was ''pushing in on the bicycle to close the door''; and (5) they were going to sell the bicycles for expense money. Tested by the foregoing rules, these statements are a series of admissions, tending to prove Ford's guilt.

Manchester, as we have already stated, gave as his explanation for possession of the bicycles, a story about receiving them from some boys to deliver downtown. In the light of all the circumstances, the jury could well have disbelieved this story as an intentional fabrication, as indicating no honest explanation for possession of the property and therefore establishing an admission of guilt. Later, when asked by the police who put the bicycles in the car, Manchester stated that he did not want to put the blame on anyone but figured it must have been one of the others. This only tended to contradict his first explanation about the boys and permitted the jury to consider it was an additional fabrication and therefore an implied admission of guilt.

We conclude, therefore, that both defendants made statements before trial which constituted at least implied admissions. It was proper for the trial court to instruct the jury with respect to its consideration of them. Since the court did not characterize the statements as confessions but left it to the jury to consider whether they were confessions or admissions, the foregoing instruction was properly given. (*People* v. *Gardner,* 147 Cal.App.2d 530, 538 [305 P.2d 614].)

Nor was the above instruction erroneous because it used the plural ''defendants.'' The court also instructed the jury that a statement made by one defendant in the absence of his codefendant could be considered only as evidence against the defendant who made such statement and could not be considered for any purpose as evidence against the codefendant. As we have already pointed out, before the testimony of

Officer DeGarcia relating defendants' statements was admitted, the court carefully admonished the jury to the same effect. We do not think that from the use of the plural "defendants," the jury necessarily would have taken this instruction to mean that they could consider the statements of one defendant as evidence against the other. But even if we assume that the use of the plural form was error, considering all the instructions together and in the light of the evidence and the careful admonitions of the trial judge, we cannot say that the jury were misled and that either defendant was prejudiced. (*People* v. *Honeycutt,* 29 Cal.2d 52, 62 [172 P.2d 698].)

The judgment and order are affirmed.

Bray, P. J., and Tobriner, J., concurred.