[Crim. No. 8234. Second Dist., Div. One. Nov. 9, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. DANIEL LYNCH VIDAL, Defendant and Appellant.

Daniel Lynch Vidal, in pro. per., for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Louis L. Selby, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In a jury trial, defendant was convicted of second degree murder. He admitted an allegation of the information that he had been convicted previously of assault with intent to commit murder. He appeals from the judgment, sentence, and order denying his motion for a new trial.

Appellant contends that the evidence was insufficient to support the conviction; and that his counsel (deputy public defender) did not properly represent him at the trial.

During the evening of September 23, 1961, defendant Vidal, aged 21 years, and Bobby Chambers (decedent), aged 31 years, had been riding in Vidal's automobile to various places including a liquor store and their homes, and they had been drinking wine. About 9 p. m. of that day they went to the home of Salvador Reyes, the stepfather of defendant, at 2047 East 76th Street in Los Angeles, where they and Reyes drank the remainder of a bottle of wine which defendant and Chambers had taken there. Then they asked Reyes whether he had anything there to drink. After Reyes took three bottles of beer from the refrigerator, the other two men scrambled and argued over two half dollars which were on a table. Chambers succeeded in getting that money. Reyes testified that defendant then went to his automobile, came back with a butcher knife

and put it on Reyes' throat; Reyes thought that defendant was playing, and after a while defendant removed the knife and put it inside his belt; after the three of them drank the three bottles of beer, Reyes sent the two men to the liquor store to get more beer—telling them to use the dollar which was on the table; they returned about 10 minutes later with two quarts of beer; after drinking that beer, the two men went through the bedroom to the lavatory; when they returned to the living room, the defendant said that Chambers had taken $7.00 from under the mattress in the Reyes' bedroom; Reyes said that was all the money he had to live on until the next month; he asked Chambers to give the money back; Chambers, who was ready to return the money, had his wallet in his hands and was looking into it, when "all of a sudden Vidal jumped up and stabbed him right in the stomach"; Chambers said nothing, stood up, took the knife out of his stomach, and walked outside with the knife in his hand; defendant stood "quiet for five minutes like he was scared," and then said, "I am going to finish him"; defendant went into the kitchen, and then went outside the house; about five minutes later, the defendant came back and said he could not find him; then defendant went to the liquor store to get another beer; when he returned with the beer, several police officers were on the street; defendant went away to get Mr. Friddle (uncle of Chambers); Reyes (witness) went to bed, and later police officers took him to the police station; defendant lived at Reyes' house approximately eight years, but about three years ago Reyes kicked him out of the house—Reyes had to get rid of him.

Mr. Friddle, an uncle of Chambers, who operates a lawn-mower repair shop in the premises where he resides (Compton Avenue in Los Angeles), testified: On said September 23, about 2 p. m., he saw the defendant Vidal at the shop. About 11 p. m. of that day the defendant came to Friddle's bedroom window and said that he had something to tell him. After Friddle let him come into the house, they sat at a table and talked approximately 10 minutes. In that conversation the defendant said he and Chambers were at Friddle's house about 6 p. m., of that day (while Friddle was away) and then they "drove around" and finally went to Reyes' house on 76th Street; that they and Reyes had been drinking; that Chambers stole $7.00 from Reyes, and the defendant got "so worked up about it" that he took the butcher knife and stuck Chambers in the stomach with it; that Chambers got up, walked out, and left the premises; that defendant had walked "around for

two or three blocks'' and could not find Chambers, and he (defendant) wanted Friddle to go with him and see if they could find Chambers. After that conversation, Friddle telephoned his sister (Chambers' mother) and told her that Chambers had met with an accident. Defendant took Friddle to the sister's house, and then defendant went on ''ahead'' in his automobile to the Reyes address (a distance of approximately 2 miles), and Friddle and the sister went in her automobile to that address. When Friddle arrived there, about 11:30 p. m., several police cars and several persons were there. The body of Chambers, with a coat over the head, was in a yard about four doors east of Reyes' residence. At that time Friddle saw defendant standing about 40 feet away at the back of the crowd, and pointed him out to a police officer who arrested him immediately.

Friddle testified further that, in the conversation at his house before going to the scene of the stabbing, the defendant said that he had had a feeling all evening that he wanted to stab somebody, and he hoped they would send him back to Soledad because he was ''afraid to stay out here''; that he did not know what he was going to do; that he had taken the butcher knife from Friddle's silverware and had stuck it into Chambers' stomach ''just as hard as he could''; that Chambers had taken $7.00 which was all that Reyes had to live on until next month—and defendant just stabbed him.

On cross-examination, Friddle said that Chambers had been drinking at the lawnmower shop from 2 to 4 o'clock that afternoon; defendant Vidal had lived at Friddle's house and worked in his shop until recently when defendant married and went away, but Friddle was not angry at him because he had married; Friddle had had possession of defendant's automobile and the pink slip (registration slip) therefor, and had sold the automobile for $87 and kept the money because defendant owed him as much as the automobile was worth.

Officer Bennett testified that on said September 23, about 11:40 p. m., he went to the vicinity of 2047 East 76th Place (vicinity of Reyes' address) and saw Chambers' dead body lying on the front walk at a house three or four houses from Reyes' address; he also saw the butcher knife (Exhibit 5) which was in the grass at the rear of the body; he had a conversation with Friddle who ''pointed out'' defendant, who was at the rear of a group of bystanders; defendant was walking away rapidly when the officer overtook and arrested him.

Officer Thornton testified that he arrived at the scene about

12 o'clock on said night and saw Chambers' body on the front walk and saw the knife (Exhibit 5) at the rear of the body; he went into the Reyes house, saw blood spots (on the floor of the living room) in front of a chair, and saw broken glass and liquid on a coffee table.

Dr. Moore, a doctor of medicine, testified that he performed an autopsy on the body of Chambers on September 24, 1961; the cause of death was hemorrhage from stabbing in the abdomen; the wound was $1\frac{1}{4}$ inches long and about 7 inches deep; the mesentery arteries had been severed, and the spine had been entered; there was alcohol in the blood but not enough to be fatal.

Defendant testified in substance as follows: On said September 23, about 6 p. m., while he was in his parked automobile in front of Friddle's house, Chambers came to the automobile, talked with him, and entered the automobile. They went to a liquor store, and then to the homes of Chambers and defendant where they drank wine. About 9 p. m. they went to Reyes' house and continued drinking wine. While Reyes was getting three bottles of beer from the refrigerator, Chambers took two half dollars which were on a coffee table. When they asked Reyes for money with which to buy more beer, he asked why they did not buy it with the money that had been taken from the coffee table. Then defendant and Chambers went to a store, bought two quarts of beer, and returned to Reyes' house. While the three of them were drinking the beer, Chambers went into the bedroom. Later, defendant went into the bedroom and Chambers showed him some money which he said he had found. They returned to the living room and began drinking beer. Reyes went into the bedroom and then demanded that Chambers give him the $7.00 which he had taken from under the mattress. Chambers got up and started toward the door, but Reyes pulled him by the arm and set him down in a chair. Reyes sat close to and facing Chambers, while talking to him. Defendant was sitting on the coffee table. The next thing defendant saw was that Chambers stood up, walked toward the door, and left the room. Defendant saw blood on Chambers' shirt and a knife in his hand. Defendant stood there a few minutes, asked Reyes what happened, but received no answer. Then he (defendant) went out of the house to see what was wrong. He went to the automobile which was parked in the alley, and then went to the front of the house and looked up and down the street, but did not see Chambers. He returned to the inside of the house and told Reyes he could not find Chambers. Then he drove his automobile to Friddle's

house, where he knocked on the window, and Friddle let him enter the house. He told Friddle that Chambers had been hurt and he could not find him. He asked Friddle to go with him and help find Chambers. He also told Friddle that Chambers and Reyes had been arguing over $7.00. Defendant and Friddle went to the home of Chambers' mother, about two blocks away. Then defendant went alone to the street where Reyes lived, while Friddle and Chambers' mother went there in the mother's automobile. When defendant arrived on the street he saw police officers and a crowd there. He entered Reyes' house, told him what he had seen outside, and said he was going outside to see whether it was Chambers. He went outside and was told that someone had been stabbed and was dead. He was arrested while he was going back to tell Reyes what had happened.

Defendant denied: that he had told Friddle that he had stabbed Chambers; that he had said anything to Friddle about Chambers' being stabbed, or about shoving the knife hard, or about hoping to be sent back to Soledad, or about having an impulse to stab someone.

Defendant testified further that Friddle did not like him, because they had had difficulties in the past, but that recently he had been going to his house again and there was always something to drink there; he had worked for Friddle, repairing lawnmowers for room, board, and some money; he owed money to Friddle for the automobile, but he had signed the pink slip over to him when he borrowed $30 from him, but he did not give Friddle permission to sell the automobile which was worth more than $89 for which he sold it; he had incurred Friddle's dislike when he married and moved away from Friddle's house about seven months previously.

On cross-examination, defendant testified: He was drinking before he saw Chambers in front of the shop on the evening of September 23. When he was arrested he had 11 cents in his pocket. He had not had a job for seven months preceding his arrest. He had known Chambers since February 1961. He did not scramble for the money which was on the table in Reyes' house—that Chambers took the money (two half dollars). He did not go to the automobile and get a knife. He did not put a knife across Reyes' throat. He did go into the bedroom when Chambers signaled to him, and he saw the money ($7.00). He did not know that Reyes kept money under the mattress. Reyes went into the bedroom and came back yelling at Chambers and asking him to hand over his $7.00. He did not see Cham-

bers when he was cut. Defendant was shocked when he saw blood on Chambers' shirt and saw a knife in his hand, but he did not say anything nor call a doctor nor an ambulance. He went to Friddle's house to try to get help. When he returned to the Reyes street he saw Friddle who was with a police officer. Someone in the crowd told him that Chambers was dead, but he (defendant) did not tell the officers that Chambers was his friend or that he was in the room when he was stabbed. He was leaving the scene when he was arrested. He had been convicted, in June 1959, of assault with intent to commit murder.

With reference to appellant's contention as to insufficiency of the evidence, he argues to the effect that the testimony of Reyes identifying him as the stabber was false, and that the testimony of Friddle regarding admissions of appellant that he was the stabber was false. He implies, in his argument, (1) that Reyes so testified in order to protect himself from being charged with the crime, and (2) that Friddle so testified because he did not like defendant. ▆ The credibility of the witnesses and the weight of their testimony were matters for determination by members of the jury, who were the triers of the facts. (*People* v. *Perez,* 19 Cal.App.2d 472, 475 [65 P.2d 1319].) ▆ As above stated, Reyes, who was present at the scene of the crime, testified that defendant stabbed Chambers, and that defendant said he was going to finish Chambers. Defendant did not call for medical aid or any aid for Chambers. Friddle testified that defendant told him that he had stabbed Chambers, and that defendant had had a feeling all evening that he wanted to stab someone. When defendant returned to the street scene, where the officers and crowd of bystanders were, he stood at the rear of the crowd and did not tell the officers that he was present when Chambers was stabbed. When he heard that Chambers was dead, he walked rapidly away. There was substantial evidence in support of the verdict.

▆ With respect to appellant's contention that his counsel, a deputy public defender, did not properly represent him, he asserts that the deputy was not interested in assisting him but tried to get him to plead guilty; that he was inclined to believe that the deputy was biased and prejudiced against him and was incompetent; that the deputy did not consider his request to subpoena witnesses for the defense; that he, the defendant, had the right to decide how he wanted his case presented, so long as it was proper procedure. He asked the

judge to relieve him from representation by the deputy, and in making that request he said that the deputy was interested only in having him plead guilty. He asserts further that the judge erred in stating that defendant was being properly represented, because the judge was not present at the interviews and could not know whether the defense was prepared properly. Defendant states that the witnesses he desired to subpoena were ''character witnesses against'' Reyes and Friddle and their testimony would have helped in determining the credibility of those prosecution witnesses.

Counsel of record for a defendant has the right to control the proceedings on behalf of his client. (*People* v. *Merkouris*, 46 Cal.2d 540, 554 [297 P.2d 999].) It might well be that counsel for defendant was of the opinion that the proposed testimony of witnesses who were not subpoenaed would be more detrimental than beneficial to his client's cause. The record does not indicate that the deputy public defender was disinterested in assisting the defendant, but on the contrary the record indicates that the deputy ably represented the defendant. Rules with respect to determining whether a defendant in a criminal case has been represented adequately are stated in *People* v. *Wein*, 50 Cal.2d 383, 410 [326 P.2d 457] and *People* v. *Ford*, 200 Cal.App.2d 905, 913-914 [19 Cal.Rptr. 758]. In the present case, the defendant was represented adequately and properly.

The evidence was sufficient to support the conviction. ''The judgment and sentence are synonymous.'' (*People* v. *Ross*, 206 Cal.App.2d 542, 543 [24 Cal.Rptr. 1].)

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied December 4, 1962, and appellant's petition for a hearing by the Supreme Court was denied January 3, 1963.